**In re 495 CENTRAL PARK AVENUE CORP., Debtor.**

**Bankruptcy No. 91 B 21387.**

United States Bankruptcy Court,
S.D. New York.

Feb. 4, 1992.

Rattet & Company, P.C., Harrison, N.Y., for debtor.

Stockschlaeder & McDonald, New York City, for John Hancock.

Reich and Reich, P.C., White Plains, N.Y., for Viewpoint Realty Corp.

## DECISION ON APPLICATION FOR AN ORDER AUTHORIZING SENIOR SECURED CREDIT UNDER SECTION 364(d)

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

495 Central Avenue Corp. ("495 Central Avenue"), the debtor in this Chapter 11 case, has moved pursuant to 11 U.S.C. § 364(d) for an order authorizing it to borrow funds from either Leon Silverman ("Silverman") and Tom Borek ("Borek"), shareholders of the debtor, or from third-party lenders supported by the personal guaranties of Silverman and Borek and permitting the lender to obtain a security interest senior to all existing security interests. John Hancock Mutual Life Insurance Company ("Hancock"), a secured creditor which holds a first mortgage on the debtor's property, opposes the debtor's motion. Hancock contends that the debtor has failed to meet the requirements of 11 U.S.C. § 364(d) asserting that the debtor has not demonstrated that it has been unable to obtain credit by any other means and that the debtor has failed to show that Hancock's position is adequately protected. Hancock also argues that under 11 U.S.C. § 1129(b) the shareholders of the debtor should not be permitted to inject new value into the property and thereby retain their ownership interests.

### FINDINGS OF FACT

1. The debtor, 495 Central Avenue, filed with this court on September 5, 1991, a voluntary petition for reorganizational relief under Chapter 11 of the Bankruptcy Code. The debtor thereafter continued in possession and control of its assets as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. The debtor's primary asset is real property and a building located at 495 Central Avenue, Scarsdale, New York. The debtor leases space in the building to various commercial tenants.

3. The debtor acquired the premises at 495 Central Avenue from Viewpoint Realty Corporation ("Viewpoint") in April, 1991. The debtor took the property subject to an existing mortgage held by Hancock. In addition, the debtor paid Viewpoint $202,-500.00 in cash and executed a purchase money mortgage in the amount of $200,-000.00 payable to Viewpoint over five years in six month installments. The purchase

money mortgage is subordinate to Hancock's secured position.

4. Hancock holds a mortgage on the property in the principal amount of $3,950,000.00. In October, 1988, Viewpoint executed a promissory note and a mortgage to Hancock secured by the premises. Hancock duly recorded the mortgage. Under the terms of the security agreement, principal and interest are payable in monthly installments over a period of five years and the entire amount of unpaid principal is due on November 1, 1993. In the event of default, Hancock has the right to accelerate the entire debt. The agreement also requires real estate taxes to be placed in an escrow account on a monthly basis.

5. Under the security agreement, $35,418.34 is the monthly amount presently payable to Hancock on the mortgage and $12,954.64 must be escrowed for real estate tax liability each month. Because the debtor purchased the property at 495 Central Avenue subject to Hancock's mortgage, the debtor must make required payments to avoid foreclosure. While the debtor only purchased the property subject to Hancock's mortgage, the debtor did not assume the promissory note that Viewpoint had executed in favor of Hancock. Therefore, Viewpoint remains obligated on the mortgage note held by Hancock. Thus, Viewpoint, the former owner of the property will be liable for any mortgage deficiency in the event of a foreclosure.

6. The debtor violated the terms and provisions of the mortgage held by Hancock by failing to make the required monthly mortgage payments on July 1, 1991. Following the default, Hancock accelerated the entire debt which totaled $3,937,993.25 and, in August, 1991, commenced a foreclosure action in New York State Supreme Court, Westchester County. That action was stayed upon the debtor's filing of the bankruptcy petition pursuant to 11 U.S.C. § 362(a).

7. The debtor has moved in this court for an order permitting it to obtain credit under 11 U.S.C. § 364(d), either from its shareholders, Silverman and Borek, or from a third party lender, which would prime the secured positions of Hancock and Viewpoint. The debtor asks the court to grant its motion on the grounds that it has met the requirements imposed by 11 U.S.C. § 364(d). First, the debtor contends that it has shown through its appraiser that Hancock's secured position is adequately protected. The debtor also argues it has established, through the testimony of Silverman as well as an independent expert witness, that alternate financing could not be obtained. Hancock opposes the debtor's motion arguing that the debtor has failed to demonstrate that the requirements of 11 U.S.C. § 364(d) have been met. Hancock further argues that the motion should be denied because subordination of its position would violate 11 U.S.C. § 1129(b) which provides that secured claims are entitled to priority over junior claims. Viewpoint, the second mortgagee, does not oppose the debtor's motion.

8. Silverman, the president of the debtor, explained that the debtor needed to borrow money to enable it to make structural changes in the building at 495 Central Avenue to attract new tenants. According to Silverman, the debtor's primary tenants, Fovama of Scarsdale ("Fovama"), a retail rug store, and Terminal Application Group, Inc. ("TAG") are currently experiencing financial difficulties and are paying rent that is substantially lower than the market rate. Both tenants previously occupied space in the debtor's building pursuant to lease agreements which have since expired and now remain in possession of the premises on a month-to-month basis. Under the expired lease agreements, Fovama's annual rent was $220,000.00 and TAG's was $180,000.00. Currently, both tenants are paying considerably less than called for under the respective leases. During the past seven months, Fovama has paid only $60,000.00 in rent and TAG has paid $48,000.00.

9. Silverman stated that the substantial decrease in rental income received by the debtor has caused the building at 495 Central Avenue to depreciate significantly in value. Indeed, appraisers for both Hancock and the debtor testified that the low rental revenue generated by the building

has contributed to the decline in the building's market value.

10. Silverman testified that the Leather Center International, Inc. ("Leather Center") which operates a chain of furniture stores in the New York metropolitan area had expressed serious interest in renting space in the building. First New York Realty Co., Inc. ("First New York"), Leather Center's exclusive real estate broker, sent Silverman a letter dated May 2, 1991, which stated that Leather Center was prepared to enter into a 15 year lease with the debtor for a portion of space that Fovama currently occupies. Leather Center offered to pay an annual rental of approximately $180,000.00 as well as its proportionate share of the debtor's real estate taxes.

11. Leather Center's proposal requires the debtor to contribute $62,000.00 towards Leather Center's cost of constructing a functional retail store. Silverman estimated that the total cost of reconstructing the premises would be in excess of $250,000.00. The proposal also requires the debtor to construct a wall, build a new store front, add a bathroom and air conditioning ducts and deliver the premises clean. Silverman explained that landlords ordinarily bear the costs of restructuring a building to meet the needs of new tenants. He also stated that he discussed and negotiated the terms of Leather Center's proposal with First New York extensively.

12. The debtor did not accept Leather Center's May 2, 1991 proposal for various reasons. Nevertheless, the prospective tenant, through First New York, recently orally renewed its offer to lease space from the debtor. In response, Silverman sent First New York a letter dated January 22, 1992 confirming the broker's oral reaffirmation of the initial proposal. Jonathan Burke, Director of Leasing at First New York, signed Silverman's letter in agreement and acknowledgement.

13. Leather Center's current offer embodies essentially the same terms and provisions as the previous offer. However, according to Silverman's letter, the debtor has additionally agreed to grant Leather Center rent free occupancy for the first seven months of the tenancy. Silverman explained that in the current economic climate, it is customary for landlords to offer prospective tenants a free rental period.

14. The debtor needs money to renovate the building in order to enter into a lease agreement with Leather Center. Silverman testified that he has diligently sought to borrow funds on behalf of the debtor from various financial institutions. He stated that every bank has refused to lend the debtor money despite his and Borek's offers to guarantee the debt personally.

15. Henry Farrand ("Farrand"), a Commercial Loan Officer at Hudson Valley National Bank, is a commercial loan specialist and was certified as an expert in this case in commercial lending practices under Federal Rule of Evidence 702. Farrand testified that, in his opinion, all legitimate financial institutions would refuse to lend the debtor money because such a loan would be junior to Hancock's secured position. He explained that banks ordinarily demand a first position on commercial real estate loans and that a junior lien or an administrative priority simply will not suffice.

16. Roger Miller ("Miller"), the debtor's real estate appraiser, valued the building at 495 Central Avenue at $2,250,000.00. Miller utilized the income approach in making his valuation, basing his appraisal on the net income that the property is presently capable of producing. According to Miller, the income approach is the method typically used by appraisers to value income producing property such as the debtor's building.

17. Miller testified that additional rental revenue would enhance the building's market value. In his opinion, if the debtor invested $625,000.00 in renovating the property in question, its value would immediately increase to $3,500,000.00 because, after the infusion of capital, the building would be capable of producing higher rental income. Miller explained that this figure is based upon the current discounted value of the cash flow which he predicted the building would generate during the next seven years. According to his cash flow

projections, Miller estimated that the building would be worth $4,000,000.00 in three years and $5,000,000.00 in five years.

18. Steven Levine ("Levine"), Hancock's appraiser, employing the income approach to valuation, concluded that the debtor's building is presently worth $2,200,000.00. Levine testified that the market value of the property would rise if its ability to produce rental income increased. He testified that after the proposed renovations, the building would be worth approximately $2,800,000.00.

19. Both experts agree if improvements of the property are made with the proposed borrowed funds, the property will increase in value. They differ, however, as to the extent of the increase in value. It is no surprise that Hancock's expert appears to be extremely conservative in calculating the expected increase in value, whereas the debtor's expert is overly optimistic in his view. The court finds that the proposed improvements will probably cause the property to increase in value to approximately $3,000,000.00. This amounts to an increase of $800,000.00 over the $2,200,000.00 appraised value expressed by Hancock's appraiser.

20. In light of the fact that the projected property improvements to be made with the requested credit will exceed the $650,000.00 loan, it follows that Hancock's secured interest will be adequately protected after the approval of the proposed $650,000.00 senior loan.

## DISCUSSION

■ The procedure by which a debtor may obtain credit is set forth in 11 U.S.C. § 364. 11 U.S.C. § 364(d)(1) enables a debtor to obtain financing secured by a lien senior to all other interests and provides as follows:

The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1). A debtor in possession has the rights, powers, and duties of a trustee pursuant to 11 U.S.C. § 1107(a). Therefore, 495 Central Avenue, as a debtor in possession, may utilize 11 U.S.C. § 364(d) to obtain credit. The debtor has the burden of proving that the requirements of 11 U.S.C. § 364(d) have been met. *In re Reading Tube Industries*, 72 B.R. 329, 331–32 (Bankr.E.D.Pa.1987). In this case, the debtor has presented substantial evidence that both prongs of 11 U.S.C. § 364(d) have been satisfied.

### Inability to Obtain Alternate Financing

■ The first prong of 11 U.S.C. § 364(d) requires the debtor to show that alternate financing is unavailable. Because super priority financing displaces liens on which creditors have relied in extending credit, the debtor must demonstrate to the court that it cannot obtain financing by other means. The Bankruptcy Code permits a debtor to borrow money in various ways less onerous to secured creditors. 11 U.S.C. § 364. A debtor, pursuant to 11 U.S.C. § 364(b), may incur unsecured debt as an administrative expense with first priority status under 11 U.S.C. § 507(a)(1). If the debtor cannot obtain credit as an administrative expense, it may acquire a loan that is either unsecured but senior to all administrative expense claims, secured by a lien on property that is not secured, or secured by a junior lien on property already secured. 11 U.S.C. § 364(c). If the debtor cannot obtain financing by any of these means, the debtor may invoke 11 U.S.C. § 364(d) and obtain credit secured by a lien on property senior or equal to a prior lien.

■ In this case, it is clear that apart from 11 U.S.C. § 364(d), the debtor cannot obtain credit. Section 364(d)(1) does not require the debtor to seek alternate financing from every possible lender. However, the debtor must make an effort to obtain

credit without priming a senior lien. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir.1986); *Reading Tube*, 72 B.R. at 332. Silverman, on behalf of the debtor, has repeatedly tried to procure financing from various banks and lending institutions. Nevertheless, he testified that he was unable to receive financing in exchange for an unsecured position. No one was willing to lend the debtor money as an administrative expense or as an expense senior to all administrative claims.

Silverman also could not obtain credit secured by a lien junior to Hancock's secured position despite his diligent efforts. He stated that the banks were simply not interested in lending to the debtor. Farrand, a specialist in commercial lending practices, substantiated Silverman's testimony and explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property pursuant to 11 U.S.C. § 363(c)(2) because there is no property in the estate which is not already subject to a lien. The debtor's property is encumbered by Hancock's lien which exceeds its appraised value.

### Adequate Protection

The second prong of 11 U.S.C. § 364(d) requires the debtor to show that the interests of the holder of an existing lien on the property are adequately protected. The Bankruptcy Code does not expressly define adequate protection, however 11 U.S.C. § 361 sets forth examples of this concept. Although 11 U.S.C. § 361 presents some specific illustrations of adequate protection, the statute is not exclusive. Rather, it suggests a broad and flexible definition providing in pertinent part as follows:

When adequate protection is required under section ... 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(3) granting such other relief, other than entitling such entity to compensation al-

lowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

The statute confers upon "the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved." House Report No. 95–595, 95th Cong., 1st Sess. (1978), *reprinted* in 1978 U.S.Code Cong. & Admin.News 5787, 6296. The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization. *Bank of New England v. BWL, Inc.*, 121 B.R. 413, 418 (D.Me.1990); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr.S.D.N.Y.1986).

In the instant case, to determine whether Hancock is adequately protected, the court must consider whether the value of the debtor's property will increase as a result of the renovations funded by the proposed financing. *Bank of New England v. BWL, Inc.*, 121 B.R. at 418. Although appraisers for both sides disagree as to what the value of the building would be following the infusion of approximately $600,000.00, there is no question that the property would be improved by the proposed renovations and that an increase in value will result. In effect, a substitution occurs in that the money spent for improvements will be transferred into value. This value will serve as adequate protection for Hancock's secured claim.

This court rejects Hancock's argument that Silverman and Borek, shareholders of the debtor, should not be permitted to inject new value in the property to retain their equity interests. Hancock asserts that allowing the debtor to do so would violate the absolute priority rule set forth in 11 U.S.C. § 1129(b). This section essentially provides that a plan of reorganization may not be confirmed if it unfairly discriminates or it is not fair and equitable with respect to each class of claims. Un-

der the statute, a plan may not be confirmed if a holder of claim or interest that is junior to the claim of a nonconsenting secured class would receive property on behalf of its claim before senior claims are fully repaid. *Phoenix Mutual Life Insurance Company v. Greystone III Joint Venture,* 948 F.2d 134, 142 (5th Cir.1991). Absent consent, all claims must be satisfied before the debtor's equity holders may retain their interests.

Although the Bankruptcy Code does not provide for a new value exception to the absolute priority rule, some courts have recognized such an exception. Under the exception, a plan may be confirmed when equity holders contribute new capital to retain an ownership interest in the reorganized debtor. *In re Woodscape Limited Partnership,* 134 B.R. 165 (Bankr.D.Md. 1991). Hancock urges this court to follow the Fifth Circuit's decision in *Greystone III,* 948 F.2d 134 (5th Cir.1991) and reject a new value exception to the absolute priority rule.

Whether or not the new value concept is an exception to the absolute priority rule is an issue which need not be addressed in the context of a motion for senior credit pursuant to 11 U.S.C. § 364(d). The absolute priority rule is a confirmation standard which does not apply to a preconfirmation contested matter involving a debtor's request to obtain senior credit. If the debtor is unable to obtain credit without giving a senior or equal lien as security, the debtor may obtain credit secured by a senior or equal lien in accordance with § 364(d) only if the holders of senior or equal liens on the property are adequately protected. In such case, the critical issue is adequate protection and not absolute priority. In the instant case, Hancock will be adequately protected because the infusion of approximately $600,000.00 in improvements from the borrowed proceeds will enhance the value of the property secured by Hancock's mortgage by at least the amount of the borrowed proceeds.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 11 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (D).

2. The debtor's motion to obtain senior priority financing under 11 U.S.C. § 364(d) is granted because the statutory requirements have been satisfied. The debtor has shown that it could not incur debt by less onerous means. The debtor has also established that Hancock's secured position is adequately protected because the infusion of capital into the building will increase the value of the property.

3. The debtor may borrow money from Silverman and Borek, shareholders of the debtor, as a senior priority loan under 11 U.S.C. § 364(d) because the statute does not prohibit such a loan.

4. A loan to the debtor from Silverman or Borek does not violate the absolute priority rule of 11 U.S.C. § 1129(b) because that statute only applies in the context of confirmation. This proceeding is not a confirmation hearing but a motion under 11 U.S.C. § 364(d).

SETTLE ORDER ON NOTICE.