**In re CHEVY DEVCO, Debtor.**

**Bankruptcy No. LA 86–18315–GM.**

United States Bankruptcy Court, C.D. California.

Sept. 30, 1987.

David A. Leipziger, Jess Bressi, Cox, Castle & Nicholson, Los Angeles, Cal., for debtor.

Frank C. Christl, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., for Guarantee Sav.

## MEMORANDUM OF OPINION RE MOTION FOR AUTHORITY TO INCUR SECURED DEBT AND GRANT SENIOR LIEN

GERALDINE MUND, Bankruptcy Judge.

Chevy Devco is a California General Partnership, consisting of James Alexander, Ronald Baumgarten, Robert Resnick, and George Krebs, all general partners. The partnership's sole asset is a shopping center located in West Los Angeles. The shopping center is improved with two two-

story buildings, a small covered parking structure, and an open parking lot. One building has retail stores on the ground floor and offices on the second floor. The other building is a defunct health club and is totally vacant.

The debtor-in-possession seeks an order of this Court approving a construction loan of $1,200,000.00 from Union Bank, with the granting of a first lien on the property as security for that loan. This would require the subordination of a tax lien and two existing deeds of trust to the new Union Bank lien.

The issue presented to this Court is whether it is proper to approve an application under 11 U.S.C. § 364(d) so as to subordinate an undersecured existing lien to a new construction lien for the purpose of creating future equity for the debtor. If so, what standards must the Court apply to assure that the subordinated creditor receives adequate protection and what is the relationship of § 364(d) with the Chapter 11 confirmation standards.

## FACTUAL MATTERS CONCERNING THE PROPERTY AND THE LOAN

The facts of this case are basically undisputed. Guarantee Savings holds a note, last modified in 1983, in the principal amount of approximately $2,750,000.00. Under the terms of the modified note, interest accrues at 13.25% per annum. The loan is to continue for 5 years and includes two five-year rollovers on renegotiated interest rates. The note requires monthly payments of principal and interest in the amount of $31,022.68. This loan is accruing interest in the amount of approximately $30,330.00 per month. No payments have been made since October, 1985.

There is a tax lien on the property which is senior to all other liens. This is in the amount of approximately $168,000.00, and is accruing interest in the amount of approximately $1,000.00 per month. There is a junior lien, presumably to an insider, in the amount of $120,000.00, which is not due for several years, on which interest accrues during that time.

The parties stipulated that the current value of the shopping center is $3,260,-000.00 and therefore no equity exists. However, the Court has previously found that if $1,000,000.00 was spent to renovate the property (particularly to transform the health club into retail stores on the ground floor and offices on the second floor), the fair market value would increase by approximately $2,600,000.00, thereby creating an equity cushion of $1,250,000.00 (or 26% of the total value of the property). It is the stated plan of the debtor to refinance the project after renovation is completed and the building is fully rented or to sell the property at that time.

The debtor seeks to obtain an order authorizing it to borrow up to $1,200,000.00 from Union Bank. A loan broker has been involved in finding the loan and will receive 3% of the loan amount for its services. Union Bank will receive 3% of the loan amount as loan and commitment fees and will receive an additional $6,000.00 or more for legal fees, appraisals, title searches, etc. The loan will be for one year at Union Bank's reference rate (currently 8.25%) plus 3% and may be extended for two additional six-month periods by payment of $24,000.00 for each extension. Union Bank requires a first deed of trust on the shopping center as collateral for the loan.

Guarantee Savings opposes approval of this loan, contending that no adequate protection exists for it. It argues that if the partners of the debtor were willing to invest money or provide collateral for the loan, there would be no need to subordinate the Guarantee Savings lien. It further alleges that an "effective reorganization" is not possible.

Although there was a question of whether the general partners (or some of them) could liquidate or encumber other assets to make a contribution to the partnership, the Court did not find that this was clearly possible and also did not find that anyone had come forward to grant credit on a junior secured basis or on an unsecured basis. Therefore, the Court finds that 11 U.S.C. § 365(d)(1) has been satisfied. The question presented to the Court was wheth-

er Guarantee would be adequately protected (11 U.S.C. § 364(d)(2)), and whether there is a requirement on the Court to weigh the benefits and detriments to the debtor and to the secured creditor when determining whether to subordinate the secured creditor's lien.

## ADEQUATE PROTECTION

■ Although § 361 contains the definition of adequate protection as this phrase is used in §§ 362, 363 and 364, the issue of adequate protection under Section 364(d)(2) is different from that in an action for relief from stay. In a motion for relief from stay, the adequate protection is meant to preserve the status quo of the creditor during a reasonable length of time. The rights of the creditor are frozen, but not changed. It is different in Section 364.

In Section 364 the rights of this creditor are being substantially changed. Prior to the new financing, Guarantee holds a second position (behind a $168,000.00 tax lien) and has little fear that it will be foreclosed out. It is not completely collateralized, but it knows the value of the property in its current state and can take steps to protect itself by seeking relief from stay and then foreclosing and selling the property.

After the new financing, Guarantee would be behind both the tax lien and a new construction loan in the amount of $1,200,000.00. The property would be under construction for some length of time and Guarantee would have no control over the construction, its decisions, its completion or the time involved. Should the construction be unsuccessful, the property may not increase in value and, in fact, it might decrease in value. Even if the property were to increase in value, it may not be sufficient to collateralize Guarantee to the extent that it is currently collateralized. Further, Guarantee may have to pay $1,200,000.00 to Union Bank to protect itself against foreclosure upon default.

Therefore in terms of adequate protection, this Court need not look at issues which are considered in § 362; i.e., whether Guarantee is an undersecured creditor entitled to American Mariner payments.

That question simply does not apply to § '364(d).

In the factual situation of this case—because there is no equity cushion—adequate protection requires the creditor to receive something which will compensate it for the decrease in value of its interest. This is the decrease from a second position to a third priority; from a largely secured loan to only a partially secured one.

■ Adequate protection under § 364(d) requires that Guarantee be given something equivalent to that which it would receive if it were voluntarily making a mixed secured/unsecured loan in a junior position. While there is no evidence before the Court as to what a junior creditor might require under these circumstances, it is clear that Guarantee should receive at least as much as Union Bank is requiring and probably a good deal more.

Union Bank is receiving 14.25% interest (variable) during the first year, and 15.25% interest (variable) in the second year. It is requiring that its monthly interest payments be made, that it have control of construction, and that the pre and post-petition property taxes be subordinated to it. This Court cannot find that Guarantee should be given less consideration than Union Bank.

*In the Matter of St. Petersburg Hotel Associates Limited,* 44 B.R. 944 (Bkrtcy.M.D.Fla.,1984) concerned a somewhat similar issue in that the senior lien was under-collateralized and the debtor was seeking to subordinate it to a new lien which would allow the debtor to renovate its hotel and thereby potentially enter into a franchise agreement with a major hotel operator. The Court found that the assumptions relied upon by the debtor were mere expectations, as there was no binding contract with the hotel operator; that the debtor would not be able to build up sufficient surplus to retire the new loan within the five-year balloon period; and that therefore the subordinated lienor would not be restored to its first priority position. The Court found that the mere payment of senior property

taxes was not enough benefit to the first lienor to allow the subordination.

The court then went on to state that the creditor was undercollateralized and therefore to permit the debtor to saddle the property with an additional senior encumbrance would further deteriorate the position of the subordinated creditor. It therefore required compensatory measures which would assure that the creditor's present position was at least preserved. On those grounds the Court denied the application.

The debtor argues that its potential success is sufficient adequate protection. But, as in the *St. Petersburg Hotel* case, the facts show that success is more fantasy than expectation.

It appears to the Court that the Union Bank loan of $1,200,000.00 would barely be enough (or perhaps not even be enough) to finance the construction. The partners are willing to put in $24,000.00 prior to the loan funding, but intend to get it back once the loan has funded. Other than that, the partners are not willing to put in any money to finance this construction.

While there is some dispute as to how soon this commercial project would lease and what percent vacancy factor should be used, the Court accepted (for purposes of this hearing) the contentions put forth by the debtor. The debtor believes that within one year they will be at full income in the amount of $55,537.00 per month. Their monthly operating expenses are expected to total $10,938.00 per month. Payment on the construction loan would equal $12,000.00 per month; tax and interest payments would be $1,000.00 per month; and interest payments to Guarantee would be $30,069.00 per month. This leaves a net operating profit of $1,530.00 per month and there is no projection that this profit will increase except through the inflation factors of higher rent (which will to some extent be offset by the inflation factors of greater expenses and the variable interest rate to Union Bank).

It therefore appears that even a successful renovation will yield barely enough cash flow to pay interest and no cash flow to repay unsecured creditors. The actual figures demonstrate that the possible benefits of renovation are speculative and will not substantially improve the position of the subordinated creditor.

## THE EFFECT OF THE CONFIRMATION STANDARD

■ It is admitted by the debtor that the proposal that was brought to this Court is equivalent to its plan of reorganization. The debtor notes that it is not using a plan of reorganization because § 1129 does not give the debtor the tools provided by § 364(d). It is stipulated by the debtor that if this subordination proposal had been put forward in a plan of reorganization, the plan could not be confirmed over Guarantee's rejection. It is only through the use of § 364(d) that the debtor can force Guarantee to subordinate its lien under these circumstances. And yet the scheme being requested by the debtor is essentially its plan of reorganization. It is a complete renovation of the sole asset of the debtor. Compared to the renovation, the eventual sale or refinance of the asset is a minor step in the reorganization processes.

Because of this, the Court finds that it must use its equitable powers and impose a balancing test to look at detriment and benefit to the various parties. Guarantee is being denied the right to protect itself and the safeguards of Chapter 11 confirmation are being circumvented. Therefore the Court finds that Guarantee's opposition to the priority lien should be viewed almost as if it were a cramdown situation. Is a senior lienor being given less than full protection so that a junior creditor or interest can benefit from it? If so, this subordination should not be allowed.

*In re Dunckle Associates, Inc.*, 19 B.R. 481 (Bkrtcy.E.D.Pa., 1982) denied a superpriority first lien on the principal asset of the debtor on the ground that neither the debtor-in-possession nor the trustee had been the requesting party. In considering the request under § 105(a), the court also rejected the argument that the proposed capital improvement would increase the

value of the asset so that junior creditors would ultimately benefit. The court cited *In re Scandia Builders, Inc.*, 446 F.Supp. 115 (D.C., N.D.Ga., 1978), which dealt with a similar request under the Bankruptcy Act:

> "[T]he bankruptcy court must not subordinate secured parties in the broad interest of increasing the value of the asset so that all creditors may ultimately fare better. A Chapter XI court should not force the secured party to take risks which he feels secured against, specifically, a superior lien." *Id* at 119.

 Although *Dunckle* and *Scandia* never specifically alluded to the confirmation standard (and *Scandia* was using a statutory scheme which has been drastically revised), the limitation that benefits cannot flow from the senior to junior parties except by consent of the senior is very clearly expressed. In this case the secured creditor is being made to subordinate so that those with lower priority can potentially make a profit. This is not to be allowed.

Further, under the facts of this case the secured creditor is being treated as if it were an investor. It is being asked to risk its money on the hope that there is a profit to be made. If there is failure, the creditor has no protection against loss. But unlike an investor, the creditor will not share in the gain if the project is successful. The debtor wants the best of all worlds—to use this creditor's money without risk and to keep the profits for itself.

For the above stated reasons this request is denied; it fails to provide adequate protection to the creditor who is to be subordinated and it does not meet the cramdown requirements of § 1129(b) although it is essentially a plan of reorganization.