**In re Charles J. MOSELLO and Patricia Mosello, Debtors.**

**Bankruptcy No. 93 B 21859.**

United States Bankruptcy Court, S.D. New York.

May 9, 1996.

Leonard E. Lombardi, Pleasantville, NY, for Debtors.

Wilson, Elser, Moskowitz, Edelman & Dicker by David L. Tillem and Melissa A. Hager, White Plains, NY, for Acquvest Company.

## DECISION ON CROSS–MOTIONS BY DEBTORS AND BY SECURED CREDITOR ACQUVEST COMPANY

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

In this Chapter 11 case the debtors seek an order (1) permitting them to borrow up to $350,000 under 11 U.S.C. § 364(d), (2) granting the proposed lender Monetary Advisory Corp. ("MAC") a security interest senior to all existing and future security interests and statutory liens on the debtors' real property located in the Hamlet of Thornwood and the Town of Mount Pleasant (the "Thornwood Property") and a superpriority claim senior to all administration claims except professional compensation and U.S. Trustee's fees, (3) permitting the debtors to use the cash collateral of secured creditor Acquvest Company ("Acquvest") and (4) equitably subordinating Acquvest's unsecured deficiency claim to that of other unsecured creditors on the Thornwood Property. Acquvest seeks an order granting its motion to vacate the automatic stay under 11 U.S.C. § 362(d)(1) and (2) with regard to the Thornwood Property, and Acquvest joins in the United States Trustee's application to convert the debtors' Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code or, in the alternative, to dismiss this case under 11 U.S.C. § 1112(b). Trial of the issues presented on these motions was held on December 18, 1995.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of the United States District Court for the Southern District of New York dated July 10, 1984 (Hon. Robert J. Ward, Acting Chief Judge) pursuant to 28 U.S.C. § 157(a). The matters adjudicated herein are core proceedings under 28 U.S.C. § 157(b)(2). The following constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

### Background

The debtors acquired the Thornwood Property in two pieces in 1984 and 1990. In June 1989 the debtors borrowed $1 million from Village Savings Bank ("Village Bank") ultimately secured by both pieces of the Thornwood Property. After default, Village Bank obtained a Judgment of Foreclosure and Sale dated May 4, 1992. Thereafter, Village Bank and the debtors executed a forbearance agreement which reduced the amount owed to Village Bank and provided a repayment schedule. In June 1993 the debtors breached the forbearance agreement, and a sheriff's sale of the Thornwood Property was scheduled for September 30, 1993. The debtors filed their petition under Chapter 11 in this case on September 27, 1993, staying the sheriff's sale. While the debtors have continued in the management of their affairs and in possession of their property as debtors-in-possession, they are a non-operating entity and have no material income.

Village Bank conveyed its interest in the debtors' note, mortgage and foreclosure judgment in May 1993 to First Fidelity Bank, N.A., which assigned these interests to ALI, Inc. in December 1993. On July 7, 1995 ALI, Inc. assigned its interests in the note, mortgage and foreclosure judgment to Acquvest.

As of February 17, 1994 the outstanding balance due and owing under the note and mortgage secured by the Thornwood Property was $1,001,454.35. ALI, Inc. filed a secured claim for this amount in February 1994 and assigned the proof of claim to Acquvest on or about July 7, 1995.

As alleged in Acquvest's motion to lift the automatic stay, the debtors have not made any post-petition payments on the note and mortgage, and their last payment on the note

and mortgage was some time prior to June 1993.

The only substantial items of property owned by the debtors are a $50,000 note receivable and the following parcels of real estate:

(i) The Thornwood Property, comprising approximately twelve acres of land located on Linda Avenue and Westerly Lane in the Hamlet of Thornwood. The debtors hope to subdivide the Thornwood Property into twenty building lots, but the number of available building lots is in dispute. The value of the Thornwood Property is in dispute, but both sides agree that the current first mortgage indebtedness exceeds the value and, therefore, that the debtors have no equity in the Thornwood Property. In addition, the Thornwood Property is encumbered by a second mortgage having a principal balance of $600,000 held by Amerifirst Mortgage Corp.

(ii) The so-called "Linda Avenue Property", a five-lot subdivided but otherwise unimproved parcel located on Linda Avenue across the street from the Thornwood Property. The Linda Avenue Property is encumbered by a mortgage lien which exceeds the value of the property.

(iii) A one-family residence occupied by the debtors at Roberta Court, Valhalla, New York (the "Roberta Court Property"), which is also encumbered by a mortgage lien which exceeds the value of the property.

In October 1995 the debtors filed their Second Amended Disclosure Statement (the "Disclosure Statement") and Second Amended Plan of Reorganization (the "Plan"). This is a liquidating Chapter 11 Plan which provides for the sale or abandonment of all of the debtors' assets. The debtors' Plan contemplates that the debtors will abandon their interests in the Linda Avenue Property and the Roberta Court Property to the respective first mortgagees pursuant to 11 U.S.C. § 554. Under the Plan all of the proposed building lots comprising the Thornwood Property would be sold and the proceeds distributed to creditors and to the debtors.

The viability of this Chapter 11 case turns upon the debtors' ability to obtain the proposed MAC financing, develop the Thornwood Property by obtaining zoning approvals and installing necessary road and sewage facilities for subdivision, and sell all of the lots for prices at appraised levels within a finite period of time. It is clear that the Thornwood Property is the only potential source of any recovery by unsecured creditors, and that substantial additional funds, which the debtors do not have, must be invested to develop the Property. The debtors assert that if they are permitted to borrow the necessary funds from MAC, they will be able to develop the Thornwood Property and market the envisioned twenty building lots at prices in the aggregate sufficient to pay off the Acquvest secured indebtedness and provide a modest recovery for the unsecured creditors and some profit for themselves.

Acquvest argues that the debtors' proposal to develop the Thornwood Property and market the building lots is highly speculative and beset by a host of contingencies and uncertainties. Acquvest argues that the debtors have no equity and thus no financial interest in the Thornwood Property, no assets or financial interest at risk and no incentive to act in the best interests of Acquvest, with whose principal the debtors have been engaged in hostile litigation (two adversary proceedings in this case, one of which is on appeal). Since MAC would have a superpriority position with respect to its $350,000 loan, Acquvest further argues that the entire risk of the proposed financing and development of the Thornwood Property would fall upon Acquvest alone. In substance, Acquvest asserts that it is being asked to finance the Plan for the potential benefit of unsecured creditors and the debtors, at the substantial risk of further erosion of its financial position by reason of the MAC superpriority debt and with no offsetting consideration, no opportunity to participate in any increment

in value and no control or influence over the funding or any aspect of the work.

### *The Proposed Funding Agreement*

The proposed Funding Agreement between debtor Charles J. Mosello and MAC is dated August 28, 1995. The Funding Agreement sets forth "the substance of the proposed funding" (Funding Agreement ¶ 1) and contemplates the execution of "financing statements, notices of schedules, other security agreements, lease agreements, instruments, documents, mortgages and mortgage notes as may be necessary or required to evidence and perfect the liens and security interests to be given to Funder pursuant hereto" (*id.* ¶ 2.e.(i)). The following provisions of the Funding Agreement are relevant to the instant motions.

- Although the Funding Agreement purports to provide financing up to a limit of $350,000 (*id.* ¶¶ 1.b, 5), the Agreement does not constitute a binding commitment by MAC to loan any amount to the debtors. Thus, paragraph 1.b states that "Loans will be advanced *at the consent of the Funder*" (emphasis supplied); paragraph 5 states that "Funder agrees, *at its sole discretion,* to make immediately available upon entry of an order of the Bankruptcy Court the sum of up to $180,000.00 ..." (emphasis supplied); paragraph 6 states that "the loan hereunder shall be due one (1) year from the date of execution hereof. Any renewal or refinance ...", with no commitment on the part of MAC to renew or refinance.

- The Funding Agreement and the debtors' motion would grant MAC a senior secured, superpriority lien on the Thornwood Property which cannot be primed or equalled by any existing or future lien on the collateral, and MAC would be granted a superpriority administrative expense claim (*id.* ¶ 2.c).

- The Funding Agreement provides:

 - for payment to MAC of an initial fee of "6% of the loan amount herein" (*id.* ¶ 2.d), or $21,000;

 - "the loan shall bear interest at the rate of 16% which is to be paid monthly" (*id.* ¶ 6), or $56,000 per year;

 - "Mosello shall pay Funder for all expenses and costs, including without limitation, ... reasonable attorneys' fees and expenses incurred by Funder in connection with [the Funding Agreement] pursuant to the schedules annexed hereto as Exhibit 'B' " (*id.* ¶ 3), but no Exhibit "B" is annexed to any copy of the Funding Agreement in the possession of the Court;

 - "Any renewal or refinance [after the one-year due date on the loan] shall entitle Funder to an additional fee of 3% thereof [$10,500] to be paid prior to or simultaneous with each renewal or refinance, together with all necessary and reasonable attorneys' fees and expenses" (*id.* ¶ 6).

- The Funding Agreement contains detailed provisions concerning "[u]se of the proceeds from the projected sales" of building lots (*id.* ¶ 5):

 - Up to "10% of the actual sale prices ... shall be used for Mosello's operating overhead" (*id.* ¶ 5(a)). Nowhere in the Agreement or at trial has "Mosello's operating overhead" been described or quantified.

 - Up to 7.5% of the actual sales prices from the sale of the first fifteen lots and up to 10% of the sales prices from the sale of the remaining five lots "shall be used for the funding of Mosello's plan of reorganization" (*id.* ¶ 5(b)). Presumably this refers to monies to be set aside for unsecured creditors.

 - "An additional $40,000.00 of the proceeds of sale from each lot may be used to obtain the release of liens held by [Acquvest]" (*id.,* ¶ 5).

 - Notwithstanding "the above proposed distributions", paragraph 5 requires the debtors to repay to MAC $25,000 per lot from the sale of the first two lots and $50,000 per lot from the sale of the next six lots, totalling $350,000, together with accrued interest.

● Paragraph 8 provides that "the lending provisions contained in this Funding Agreement shall automatically terminate and all the amounts actually advanced by the funder hereunder shall immediately become due and payable upon the happening of any of the following events", namely: "(a) Completion of the construction and/or sale, assignment, transfer or other disposition of the property; (b) appointment of a chapter 11 trustee or conversion to chapter 7; (c) granting by the court of any other secured superpriority or claim pursuant to section 364 which is senior to or pari-passu with the MAC lien; (d) granting of a motion to lift the stay with regard to any portion of the Thornwood Property."

## The Debtors' Development Scheme and Plan

Resolution of the pending cross motions requires a detailed examination of the debtors' overall scheme for subdivision and development of the Thornwood Property into twenty building lots and sale of those lots, as well as the financial aspects of the debtors' proposed Plan. The sources of the figures set forth below are the moving affidavit of Charles Mosello in support of the section 364(d) motion, the debtors' pretrial order, Exhibit 23, the trial testimony of Charles Mosello and the trial testimony of the debtors' expert witness Eugene Albert and his appraisal dated October 24, 1995 (Exhibit 1). Since the figures in these several sources differ to some extent, the Court has attempted to reconcile the differences in a manner consistent with the debtors' overall development scheme and Plan. The important point is that these figures are the debtors' own projections.

The Thornwood Property actually consists of two distinct parcels of land, referred to as Parcel 1 and Parcel 2. Parcel 1 comprises 2.07 acres fronting along the southeast side of Linda Avenue and has received preliminary (but lapsed) approvals for subdivision into nine building lots measuring approximately 100 feet by 100 feet. Two of the nine building lots in Parcel 1 were previously sold by the debtors, leaving seven lots available for further development and sale. Parcel 2 comprises 9.54 acres and lies along the eastern edge of Parcel 1 beginning at the terminus of Westerly Lane South. Nothing has been done to commence the subdivision approval process for Parcel 2. The debtors' Plan requires that Parcel 2 be approved for subdivision into thirteen building lots, some of which might be the same size and shape as the Parcel 1 lots, others varying in size up to one acre.

Having previously obtained preliminary approval for the Parcel 1 subdivision, the debtors expect to receive final approval within 60 days after court approval of the MAC financing and thereupon promptly proceed with site work (construction of road and sewage facilities) on which rudimentary work has already been done. With respect to Parcel 2, soon after court approval of the MAC financing the debtors intend to commence the engineering and other professional work necessary to file the requisite applications for subdivision approvals. The debtors' Plan assumes that all approvals necessary for Parcel 2 will be obtained within six months.

Assuming timely receipt of all subdivision approvals, the debtors project sales of the proposed twenty building lots in three separate stages, each having its own budget and timetable, over a three-year period.

The first stage would involve the seven 10,000 square foot lots comprising Parcel 1. The debtors project that all seven Parcel 1 lots would be sold at prices averaging $95,000 (the debtors' appraisal value per lot) within twelve months following approval of the MAC Funding Agreement. Total receipts from the sale of these seven lots would be $665,000. The following costs and distributions or set-asides would be charged against the $665,000 of receipts during the first stage:

## First Stage Costs

| | |
|---|---:|
| MAC interest | $ 56,000 |
| MAC points | 21,000 |
| MAC attorneys' fees | 2,500 |
| Ch. 11 administration expense | 75,000 |
| Town of Mount Pleasant | 23,390 |
| Cost of installing roads, drainage, sewage and utility facilities | 162,410 |
| Real estate brokers' and attorneys' fees | 43,050 |
| Real estate taxes | 7,125 |
| New York State transfer tax | 3,080 |
| Bond renewal | 4,500 |
| New York State recording fees | 3,475 |
| Title company | 1,040 |
| Total costs | $402,570 |

### Set–Asides

| | | |
|---|---:|---:|
| Acquvest payments [1] | $381,500 | |
| Unsecured creditors | 52,500 | |
| Total set-asides | | $434,000 |
| Total first stage costs and set-asides | | 836,570 |
| First stage receipts | | 665,000 |
| First stage deficit | | $171,570 |

In the second stage the debtors expect to sell six of the thirteen building lots comprising Parcel 2 during the second year of the project for prices aggregating $828,462, averaging $138,077 per lot. The debtors' projected costs and set-asides for the second stage are as follows:

## Second Stage Costs

| | |
|---|---:|
| MAC interest | $ 56,000 |
| MAC points | 10,500 |
| Engineering costs | 35,000 |
| Cost of installing roads, drainage, sewage and utility facilities | 361,000 |
| Performance bond | 6,500 |
| Real estate taxes | 9,462 |
| Access costs | 15,000 |
| Real estate brokers' and attorneys' fees | 47,881 |
| Town engineering and inspection fees | 15,000 |
| Town recreation fees [2] | 13,000 |
| New York State transfer taxes | 3,960 |
| Total costs | $573,303 |

### Set–Asides

| | | |
|---|---:|---:|
| Acquvest payments [3] | $354,000 | |
| Unsecured creditors | 45,000 | |
| Total set-asides | | $399,000 |
| Total second stage costs and set-asides | | $972,303 |
| Second stage receipts | | 828,462 |
| Second stage deficit | | $143,841 |
| First stage deficit carried forward | | 171,570 |
| Total first and second stage deficits | | $315,411 |

1. Based on $50,000 per lot plus 9% interest for the full year assuming Acquvest makes the election under 11 U.S.C. § 1111(b)(2). The amount would not be materially different if Acquvest does not make the section 1111(b)(2) election, based upon the value determined by the Court below.

2. Based on $1,000 for each of the thirteen Parcel 2 building lots. Other witnesses testified that the recreation fees could be as high as $5,000 per lot, in which case the total for this item would be $65,000.

3. See footnote 1; two years' interest.

Commencing in the third year of the project, the debtors would own seven remaining subdivided building lots in Parcel 2 which they expect to sell during the third year for prices aggregating $966,539, averaging $138,-077 per lot. All development costs and expenses would have been paid. The debtors project the following costs and set-asides in connection with the third stage:

### Third Stage Costs

| | | |
|---|---:|---:|
| MAC interest [4] | $ 23,000 | |
| MAC points | 10,500 | |
| Real estate broker and attorneys' fees | 55,576 | |
| Real estate taxes | 15,000 | |
| New York State transfer taxes | 3,866 | |
| Total costs | | $107,942 |

### Set–Asides

| | | |
|---|---:|---:|
| Acquvest payments [5] | $444,500 | |
| Unsecured creditors | 65,000 | |
| Total set-asides | | $509,500 |
| Total third stage costs and set-asides | | 617,442 |
| Third stage receipts | | 966,539 |
| Third stage profit | | 349,097 |
| Less first and second stage deficits | | 315,411 |
| Net profit to the debtors [6] | | $ 33,686 |

### *Valuation*

The question of valuation of the Thornwood Property was addressed by expert witness Eugene Albert and his appraisal dated October 24, 1995 (Exhibit 1) on behalf of the debtors and by expert witness Kenneth Golub and his appraisal dated November 17, 1995 (Exhibit E) on behalf of Acquvest.

A threshold issue is to select the proper approach to valuation for the determination of fair market value. The debtors' expert, Eugene Albert, employed two different approaches producing radically different valuations. One approach was based on a bulk sale of the entire 11.61 acres as residential property without regard to the potential for subdivision and sale of smaller building lots. Using this "bulk sale" approach, Mr. Albert located the "most similar and recent sales of residential land in the market area" and made "appropriate adjustments" to "represent a reliable range of value per [acre]" as a comparative basis for valuing the Thornwood Property. Mr. Albert selected six sales of unimproved residential land between October 1992 and April 1995, ranging from 4.58 acres to 83.3 acres and, after applying adjust-

4. This interest figure apparently assumes that all sales will be made and cash received long before the end of the third year.

5. See footnote 1; three years' interest.

6. The debtors project a profit to themselves of $72,634 (Pretrial Order p. 15) or $57,599 (Exhibit 23 p. 8), rather than $33,686. But neither the pretrial order nor Exhibit 23 nor Mr. Mosello's testimony shows how the debtors' figures are derived, and both documents contain demonstrable omissions and miscalculations. As previously noted in the text, the foregoing tables of costs and other set-asides are derived entirely from the debtors' own figures.

ments, derived "median" and "average" values per acre of $40,258 and $40,865, respectively. Applying the per acre value to the 11.61 acres comprising the Thornwood Property, Mr. Albert produced a value of $465,-000. The debtors urge the Court to adopt this figure as the value of the Thornwood Property.

The other approach to value employed by Mr. Albert is the "Discounted Cash Flow Analysis", which is also the approach employed by Acquvest's appraiser, Kenneth Golub. Under the heading "Highest and Best Use Analysis", Mr. Golub states:

> Before we can proceed with the valuation we must define what the subject property is and the best way to use it so as to maximize its value. Optimal use is a specific use which will result in the highest market value. A concern with this property is the possibility of packaging the property for marketing or dividing the property in different · ways. The disciplined appraiser reviews the various ways to use the property, and then selects that use where maximum value can be realized. This search for the optimal use is the highest and best use analysis (Exhibit E at 18).

Quoting from *The Dictionary of Real Estate Appraisal,* Second Edition, 1989 (p. 149), Mr. Golub presents the following definition of "highest and best use":

> The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, fi-

nancial feasibility, and maximum profitability (*id.*).

Mr. Golub concludes that the highest and best use of the Thornwood Property would be the development and sale of as many individual lots as possible under zoning regulations, rather than a bulk sale premised on a single 11.61 acre residential building lot using a per acre valuation approach. As stated by Mr. Golub: "Anyone attempting to buy this land on the basis of price per acre would immediately be outbid by a builder calculating lot prices" (*id.*).

Mr. Albert agrees. Under the heading "Highest and Best Use Analysis", Mr. Albert concludes: "Thus, as of the appraisal date, the highest and best use for the subject property is for single-family residential construction in accordance with zoning and subdivision regulations found to be applicable to the property as indicated herein" (Exhibit 1 at 19). Accordingly, I reject the bulk valuation approach employed by Mr. Albert which produced a figure of $465,000. Since both experts agree that the highest and best use of the Thornwood Property is for subdivision into the maximum allowable building lots, rather than a bulk sale, I conclude that a discounted cash flow analysis utilized by both experts is the proper approach to valuing the Property.[7]

The discounted cash flow analyses employed by both experts are sufficiently similar that the differences may be readily identified and assessed. In performing the analysis, both experts make an assumption as to the number and size of building lots which will be approved, estimate a per lot sale price based upon comparable sales, estimate the time it will take to obtain the

---

7. It must be noted that Mr. Albert does not give an "opinion" that $465,000 constituted the market value of the Thornwood Property. His conclusion with respect to the $465,000 figure appears under the heading "Indicated Value–Sales Comparison Approach" with the text: "The value estimated above [$465,000] is representative of the market value of the subject property as it currently exists, with no subdivision approvals"

(Exhibit 1 at 39). Mr. Albert's professional "opinion" or "conclusion" as to market value appears at page 40 of his appraisal under the heading "Conclusion of Market Value" with the statement: "Based upon the foregoing data and analyses, it is our opinion that the market values of the subject properties as they existed on October 19, 1995 were [$350,000 for Parcel 1 and $950,000 for Parcel 2]" (*id.*).

regulatory approvals, perform the development work and sell the lots and budget for all of the costs which will be incurred during the life of the project. A discount rate per year is then applied to the net receipts to derive a present worth. Mr. Albert concluded as quoted in footnote 1 above, namely, $350,000 for Parcel 1 and $950,000 for Parcel 2, totalling $1,300,000. Mr. Golub concluded: "My opinion of the market value of the property in fee simple as of November 15, 1995, based upon my independent appraisal and the exercise of my professional judgment is $970,000", including $270,000 for Parcel 1 and $700,000 for Parcel 2 (Exhibit E at 31).

The $330,000 difference in those valuations is explained by two major variants. The first is that Mr. Albert based his appraisal on per lot valuations of $95,000 and $165,000 for 10,000 square foot and 40,000 square foot building lots, respectively, whereas Mr. Golub valued lots of these sizes at $90,000 and $160,000, respectively. Considering the fact that the debtors contracted to sell four Parcel 1 lots in June and October 1992 at prices of $90,000, $90,000, $80,000 and $72,500, none of which closed, and in fact sold two Parcel 1 lots in April 1993 at prices of $90,000 and $73,000, and after reviewing the comparable sales and adjustments relied upon by each of the experts, I conclude that the $90,000 and $160,000 figures used in Mr. Golub's appraisal are more realistic bases for determining fair market value as of the date of filing this case, September 27, 1993.

The second substantial variant between the experts is that Mr. Albert based his appraisal upon a thirteen-lot subdivision of Parcel 2, while Mr. Golub based his appraisal on an eleven-lot subdivision of Parcel 2. Mr. Albert did not make an independent assessment of the available number of building lots, but based his assumption on representations by Mr. Charles Mosello, stating:

[B]ased upon conversations with Charles Mosello, the town has agreed that the site can be developed with thirteen building lots.... According to Charles Mosello, the site will be subdivided into thirteen

lots, eight of which will be one-acre lots and five of which will be quarter-acre lots. The subdivision of this parcel into 13 lots is based upon a subdivision map ... filed with the county more than thirty years ago; Mosello has indicated that the only prior problem related to the subdivision of this parcel, as described, was the access. However, he has since gained the right to access the property via an extension of Westerly Lane.

For this appraisal, we have assumed that the site can be subdivided into thirteen building lots as described above, and will meet the requirements of the town. (Exhibit 1 at 17).

Mr. Golub's eleven lot assumption is based upon calculations set forth in his appraisal (Exhibit E at 19–20).

The representations attributed to Charles Mosello and relied upon by Mr. Albert in support of his thirteen lot assumption are not supported by the evidence. To the contrary, it is clear from the evidence at trial that the number of building lots available in Parcel 2 has not been approved by the requisite authorities and is likely to be the subject of controversy and perhaps litigation. Indeed, there has already been controversy and litigation. It appears that the debtors' first application for preliminary subdivision was denied by the Planning Board of the Town of Mount Pleasant on March 1, 1990. The debtors commenced an Article 78 proceeding resulting in a March 28, 1991 Order directing the Planning Board to consider additional material and to issue a written decision. The Planning Board's written decision was rendered May 7, 1991, again denying approval. On the debtors' motion to renew, Supreme Court, Westchester County (Silverman, J.) vacated that portion of the Planning Board's determination which directed that access to the Parcel 2 development be through Bellevue Avenue, rather than Westerly Lane as the debtors had argued, and remanded to the Planning Board for a new determination. However, on the issue of lot averaging and zoning density Justice Silverman found support for the Planning Board "finding that petitioners' subdivision applica-

tion exceeds permitted density given its existing layout" (Exhibit H at 2). Moreover, with regard to access to Parcel 2 it appears on the evidence at trial that the Westerly Lane access relied upon by the debtors is no longer available to them. Uncertainty as to the available building lots is further evidenced by a February 8, 1995 report entitled "SUBDIVISION APPROVAL Status & Development Potential Eleven Acre Subdivision Linda Avenue, Mount Pleasant, New York" apparently prepared for the then holder of the first mortgage on the Thornwood Property by Inspection & Valuation International, which concluded that "depending on the access road and complying with all the town standards, the number of lots achieved [for Parcel 2] may be less than nine (9)" (Exhibit F at 8).

The Planning Board ultimately may approve a thirteen lot subdivision of Parcel 2, or it may not. For purposes of this proceeding, based upon all of the evidence before me I conclude that it is unreasonable to believe that a prospective buyer, fully informed, would predicate his purchase price of the Thornwood Property on the basis of a thirteen lot subdivision. Accordingly, I conclude that Mr. Golub's appraisal, based on an assumed eleven lot subdivision, provides a more reliable estimate of fair market value.

For the foregoing reasons, I accept the appraisal submitted on behalf of Acquvest by Mr. Golub and conclude that the fair market value of the Thornwood Property as of the date of filing was $970,000.[8]

### Superpriority Financing and Adequate Protection Under Section 364(d)

■ As a general principle the Bankruptcy Code recognizes the primacy of pre-petition contractual liens and seeks to preserve the financial interests created thereby. Section 364(d) evidences this policy. The statute provides:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or .equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

I have no difficulty in concluding that the debtors have sustained their burden under subsection (1)(A) that "[the debtors are] unable to obtain such credit otherwise" than by superpriority financing. One of the witnesses testified that it would be "suicide" to take a second position for advancing new money in the circumstances presented by this case, and this testimony was intuitively compelling and uncontradicted. The terms of the proposed financing are undoubtedly onerous. But the debtors had every incentive to negotiate the most favorable terms possible, and it appears from the evidence that Mr. Mosello made substantial efforts to obtain financing from a number of sources. The record does not support a conclusion that the debtors have failed to meet their burden under subsection (A) of section 364(d)(1).

However, I conclude that the debtors have not sustained their burden of proof on the issue of "adequate protection" under section 364(d)(1)(B). Turning first to the statute, 11 U.S.C. § 361 provides as follows:

### § 361. Adequate protection.

When adequate protection is required under section 362, 363, or 364 of this title

---

8. Both experts' appraisals speak as of the fall of 1995, and both assume modest annual inflation in the selling prices of building lots over three years (Albert) or four years (Golub). However, neither expert has suggested that values in late 1995 were materially different from values in September 1993, and neither party has so ar-

gued. To the contrary, text in each appraisal indicates that land values in Westchester for several years prior to 1995 had remained flat. Accordingly, there is no basis in the record before me to conclude that the value of the Thornwood Property was materially different in September 1993 from the value in the fall of 1995.

of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

Subsections (1) and (2) of section 361 are unavailing here. There is no possible source from which the debtors could make a "cash payment or periodic cash payments", other than from the sale of lots upon which Acquvest already holds first lien, and the debtors have no unencumbered property which could be used to provide "an additional or replacement lien" to Acquvest. Thus, the debtors resort to the catchall provision in subsection (3), which provides for "granting such other relief ... as will result in the realization by [Acquvest] of the indubitable equivalent of [Acquvest's] interest in such property."

Stated concisely, the debtors' position is that expenditure of the MAC loan proceeds to develop the Thornwood Property will result in an increase in value of the Property greater than the amount of the loan, and that this increase in value alone constitutes "adequate protection" in compliance with section 364(d)(1)(B). However, the facts in this case do not support the proposition that a prospective increase in value of the Thornwood Property will constitute "adequate protection" against diminution in Acquvest's interest in the Property by reason of the proposed superpriority financing.

The purpose of "adequate protection" for a creditor "is to insure that the creditor receives the value for which he bargained prebankruptcy." *In re Swedeland Development Group, Inc.,* 16 F.3d 552, 564 (3d Cir.1994) (en banc), quoting from *In re O'Connor,* 808 F.2d 1393, 1396 (10th Cir. 1987). "The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization." *In re 495 Central Park Avenue Corp.,* 136 B.R. 626, 631 (Bankr.S.D.N.Y.1992). "In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *In re Swedeland Development Group, Inc.,* 16 F.3d at 564.

As stated in *In re Dunes Casino Hotel,* 69 B.R. 784, 793 (Bankr.D.N.J.1986): "Adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy", citing *In re Coors of the Cumberland,* 19 B.R. 313, 321 (Bankr. M.D.Tenn.1982). The Congressional intent to preserve pre-petition contractual financial interests by means of the adequate protection requirement is evident in the House Report, quoted in *In re Dunes Casino Hotel,* 69 B.R. at 793–94:

[Adequate protection] is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interests. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor re-

ceives in value essentially what he bargained for.

H.R.Rep. No. 595 at 339, 1978, U.S.Code Cong. & Ad.News at 5787, 6295. Other cases have stated that the "important question" in determining the adequacy of protection under section 364(d)(1)(B) is whether the interest of the secured creditor whose lien is to be primed "is being unjustifiably jeopardized." *In re Plabell Rubber Products, Inc.*, 137 B.R. 897, 899 (Bankr.N.D.Ohio 1992), quoting from *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr.E.D.Pa.1991).

 The determination of adequate protection is a fact-specific inquiry. "Its application is left to the vagaries of each case ... but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *In re Beker Industries Corp.*, 58 B.R. 725, 736 (Bankr.S.D.N.Y.1986). "Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected." *In re First South Savings Association*, 820 F.2d 700, 710 (5th Cir.1987).

The debtors rely on two cases claimed to be "similar to the case at bar." (Debtors' Trial Memo at 4). One such case, *In re Dunes Casino Hotel, supra*, bears no resemblance to the facts here. In that case, the creditor whose lien was to be primed was secured by "collateral valued on a worst case basis" in an amount of "*at least* $8,000,-000.00" in excess of the indebtedness. 69 B.R. at 795, emphasis in original. Moreover, the proposed superpriority financing, approximately $700,000, represented only a small fraction of the indebtedness ($17,663,900) and the "worst case" value of the collateral ($26,-200,000). In contrast with the $8 million equity cushion in the *Dunes Casino* case, the Acquvest indebtedness exceeds the value of the collateral, and the amount of the proposed superpriority financing ($350,000 plus 16% interest [$56,000 each year], 6% closing points [$21,000], 3% renewal points [$10,500 each year] and the lender's legal fees) represents a large percentage of the total indebtedness ($1 million) and the value of the collateral ($970,000).

The other case relied upon by the debtors is *In re 495 Central Park Avenue Corp., supra.* In that case the debtor's primary asset was a commercial building. The John Hancock Mutual Life Insurance Company ("Hancock") held a first mortgage on the property securing a debt of $3,938,000. Two of the debtor's tenants were experiencing financial difficulties and paying rent substantially below market. To replace these tenants with others willing to lease space at much higher rates, the debtor sought $625,-000 in superpriority financing to renovate portions of the building. The debtor's real estate expert opined that such an investment would immediately increase the value of the building from $2.2 million to $3.5 million, and that this value would increase to $4 million in three years and $5 million in five years. Hancock's appraiser, while agreeing with the present worth valuation of $2.2 million, was far more conservative in his estimate of the potential increase in value. Judge Schwartzberg concluded that the proposed renovations would cause an immediate increase in value to approximately $3 million, $800,000 over the present value. Judge Schwartzberg concluded: "In light of the fact that the projected property improvements to be made with the requested credit will exceed the $650,000.00 loan, it follows that Hancock's secured interest will be adequately protected ..." (136 B.R. at 630), stating "there is no question that the property would be improved by the proposed renovations and that an increase in value will result." *Id.* at 631. The underlying facts on which Judge Schwartzberg based this conclusion apparently were not subject to any material speculation, uncertainty or dispute. The property in question was an existing, fully operational building filled with tenants paying rent. Specific renovations in the building would enable the debtor to rent designated space to one or more identified prospective tenants at market rates. The opinion does not reveal the presence of any speculative or uncertain elements in the proposed transactions such as costs, regulatory approvals or timing. In short, while the experts might disagree as to the ultimate valuation, there does not appear

to have been any material element of uncertainty or risk in the renovation project. The only argument by Hancock in opposition to the proposed financing addressed in the decision was that the principals of the debtor should not be permitted to inject new value in the property to retain their equity interests.

By contrast, in this case the debtors' development scheme is beset by uncertainty and risk, and the ultimate outcome of the project is a matter of speculation based upon assumptions which cannot be quantified or verified by objective evidence. There is no dispute that real estate development is highly speculative. The unsuccessful efforts over the course of years of these debtors to develop these very properties, despite the substantial financing they have already received ($1,600,000 of first and second mortgage loans on the Thornwood Property) attests to the risks here involved. The debtors' Plan for development of the Thornwood Property entails many elements of uncertainty not present in *In re 495 Central Park Avenue Corp.* Principal among these are the following.

● *Number of building lots.* The economic viability of the debtors' Plan is dependent upon obtaining thirteen building lots from Parcel 2. No knowledgeable witness purported to demonstrate that the Planning Board would be compelled by applicable regulations to approve thirteen lots, or even that the Board would in all likelihood do so. The Westerly Lane access, which would have facilitated thirteen lots, apparently is no longer available. The debtors' expert witness, Eugene Albert, expressed no opinion of his own with regard to the number of building lots, but relied upon Mr. Mosello's representation that thirteen lots had been approved, which was not borne out by the evidence. Acquvest's expert witness, Kenneth Golub, based his appraisal upon an eleven-lot subdivision and presented calculations demonstrating the basis therefor. There has already been Planning Board and community opposition to the debtors' proposed subdivision. Several of the witnesses on both sides testified, in substance, that further opposition could be expected, and the debtors have not even suggested that there will be no opposition to a thirteen-lot subdivision. Assuming an average selling price of approximately $140,000 for each of the Parcel 2 building lots, as both experts assumed, the loss of only two building lots would cost the debtors some $280,000, eliminating the projected returns to the debtors and to the unsecured creditors, reducing the payments to which Acquvest is entitled by statute and probably dooming the entire project.

● *Building lot resale prices.* As noted above, the experts differed by $5,000 per building lot in their opinions as to the projected sale prices of the lots. Extrapolated over the twenty lots for which the debtors expect to receive Planning Board approval, the difference of $100,000 could have a major impact upon the viability of the project. Of course, the lots may sell for prices higher than projected by the experts, and several of the debtors' witnesses expressed such optimism. But the market may be hostile, for reasons which are neither predictable nor within the debtors' control. Unlike the prospective commercial tenants in *In re 495 Central Park Avenue Corp.*, no prospective buyers have demonstrated a willingness to commit themselves to purchase all or any of the debtors' prospective building lots when, or if, they are approved and developed a year, or two, or three in the future.

● *Development costs.* The debtors have budgeted $162,410 and $361,000 for road, drainage, sewage and utility facilities for Parcel 1 and Parcel 2, respectively. These are engineering estimates, not proposals or contracts from any contractor. The actual costs are not likely to be less, but they may be substantially more than was projected several years prior to the work. No amount has been budgeted for professional fees needed to obtain subdivision approvals from the Planning Board, including possible litigation. Recreation fees for the Parcel 2 building lots, budgeted at $1,000 per lot or $13,000 total, may be as much as $5,000 per lot or $65,000 total (see footnote 2). Nothing has been budgeted for the services and expenses of a person to orga-

nize and supervise the development project, presumably on the assumption that Mr. Mosello will discharge this function for the next three years or so without compensation. Aside from the question of Mr. Mosello's competence to do so (disputed by Acquvest), Acquvest will be at risk of a substantial unbudgeted cost in the event that Mr. Mosello becomes disabled or finds a better way to earn a living before the project is completed.

● *Timing of approvals.* The approval process for the seven-lot Parcel 1 subdivision should be completed within thirty to sixty days, since that subdivision has already been approved and is not controversial. For Parcel 2 the prognosis is far less clear. Two of the debtors' knowledgeable witnesses guessed that optimal approval time would be eight months, while acknowledging that the process might take years. The debtors' futile efforts to obtain subdivision approval in several years of administrative and court proceedings and the near certainty of further opposition to this project [9] undermines the debtors' assumption that approval for Parcel 2 will be forthcoming within six months. More realistic is the estimate of Acquvest's witness, Steven M. Silverberg, Esq., that it may take 1½ to 2 years to obtain final approval for a Parcel 2 subdivision.

● *Other potential causes of delay.* Two other potential causes for delay are (i) the time to complete the physical work of clearing, grading and installation of road, sewage and utility facilities and (ii) the time which will be necessary to market the building lots. The former depends primarily on the weather and the seasons during which the work must be done. The latter depends upon economic conditions and supply and demand in the local real estate market. None of these variables is entirely predictable or within the debtors' control.

● *The impact of delay.* The most obvious potential consequence of delay is increased costs. If the debtors' schedule were delayed by just one year, interest costs alone would increase by $124,000, including $65,500 on the MAC loan (16% interest of $56,000 plus 3% renewal fee of $10,500) and at least $58,500 on the Acquvest debt (9% interest applied to $650,000 remaining assuming $350,000 paid down in the first stage). More important, any material delay would cause the project to founder for lack of working capital.

● *Lack of working capital.* Indeed, working capital will almost certainly be insufficient even without delay. The debtors' first stage costs for the first year total $402,570, some $50,000 more than the MAC loan. To obtain Parcel 2 subdivision approval within six months, the debtors must spend at least $80,000 more,[10] totalling $130,000 in excess of the MAC loan. Since Acquvest would be entitled to $50,000 plus interest from the sale of each lot, the debtors would have to sell at least three Parcel 1 lots for more than $95,000 each in the first six months, from which they would retain $45,000 each or $135,000 to fund that $130,000 excess, and the debtors would have to ignore the per lot set-asides for unsecured creditors and the per lot repayments to MAC required under the Funding Agreement. If all goes well in the first stage, the debtors will nevertheless have sustained a loss of $171,570 at the end of one year, which must be funded out of the MAC loan. This would leave only $178,430 in loan proceeds to fund second stage costs budgeted at $573,303, a shortfall of $394,873 to be funded out of sale proceeds during the second year. Even assuming sale of all six lots during the second year at prices averaging $138,077, after deducting the $59,000 per lot required to be paid to Acquvest ($50,000 plus $9,000 interest) the sale of the six lots would produce cash proceeds of $474,462, a cushion of only $80,000 more than the shortfall, and this assumes that nothing is set aside for unsecured creditors, that no principal is repaid to Acquvest as required

---

9. As one of the debtors' witnesses acknowledged, there is "always" going to be community opposition.

10. Town engineering and inspection fees $15,000, recreation fees $13,000, real estate taxes $9,462, bond $6,500, engineering costs $35,000, total $78,962.

by the Funding Agreement and that the lots can be sold before the money is available to do the development work. Thus, the debtors' Plan cannot work using the debtors' own assumptions, because the debtors do not have enough borrowing power to fund both the deficit from the first year and the expenses required for the second.

● *The Funding Agreement.* The basic problem with the Funding Agreement is that it is illusory. As noted above, the Funding Agreement states unequivocally that loans will be advanced "at the consent of the Funder" (¶ 1.b) and "at its sole discretion" (¶ 5). Nowhere in the Funding Agreement can language be found constituting an obligation or commitment on the part of MAC to advance any funds, or to renew or refinance at the end of the one-year term of the Agreement. Paragraph 5 provides for MAC to make available "the sum of *up to* $180,000.00", although the debtors' Plan clearly requires expenditures far in excess of $180,000 within the first six months in order to finance Parcel 2 subdivision approval as well as Parcel 1 approval, development work and sales. If MAC does advance funds under the Agreement, the loan is due within one year (¶ 6), and paragraph 5 requires payments to MAC of $25,000 from the sale each of the first two lots and $50,000 from the sale of each of the next six lots, with the MAC payments having priority over the per lot distributions for Acquvest and the unsecured creditor fund. This is impossible, as shown above.

■ In short, there are no hard facts on which to base a finding of adequate protection in this case. There is no question that the MAC loan will cause a dollar-for-dollar diminution in the value of Acquvest's secured position. After one year that diminution will be $440,000 ($350,000 principal, $56,000 interest, $21,000 initial fee, $10,500 renewal fee and at least $2,500 attorneys' fees). Adequate protection must protect the creditor "from diminution in the value of its collateral *during the reorganization process*", *In re Beker Industries,* 58 B.R. at 736, emphasis supplied; "adequate protection is to safeguard the secured creditor from diminution in the value of its interest *during the Chapter 11 reorganization*", *In re 495 Central Park Avenue Corp.,* 136 B.R. at 631, emphasis supplied. There cannot be any material enhancement in the value of the Thornwood Property until completion of or at least substantial progress in the physical improvements, or until the Planning Board approvals, or more likely both. Whether it takes six months or two years to obtain Planning Board approval, and whether or not the physical work is accomplished on schedule, it is certain that Acquvest will be unprotected from the diminution in the value of its lien for much of the duration of the reorganization process even if everything proceeds as projected by the debtors. The diminution is compounded by the release of Acquvest's lien on each building lot as it is sold despite the fact that Acquvest would be entitled to receive only a portion of the sale proceeds from each lot. Moreover, the project is subject to the numerous risks described above, which are by no means fanciful, any of which could cause the project to fail. Finally, the project is entirely dependent upon the willingness to proceed of the debtors and of MAC, neither of whom will be subject to legal constraint or meaningful economic incentive to proceed if they perceive it to be in their individual interests to abandon the project at any time.

■ A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis. In *In re First South Savings Association,* 820 F.2d at 712, the Court of Appeals stated that the debtors' proposed post-petition financing should be rejected where "[t]he numbers (i.e. value, income) offered by those called by the debtor to testify were ... based on assumptions that are not supported in the record." Superpriority financing was denied in *In the Matter of St. Petersburg Hotel Associates Ltd.,* 44 B.R. 944, 946 (Bankr. M.D.Fla.1984), where "[a]n examination of the assumptions relied on by the Debtor which forms [sic] the basis for the proposition that the Mortgagee is adequately protected reveals that the assumptions are mere expectations, many of which are highly speculative and unrealistic." To the same effect, see *In re Timber Products Inc.,* 125 B.R. 433,

440 (Bankr.W.D.Pa.1990) ("Debtors ignore all potential negative contingencies and are overly optimistic regarding the basic expenses to be incurred"). In rejecting an argument similar to the debtors in this case, the Court of Appeals for the Third Circuit sitting en banc in *In re Swedeland Development Group, Inc.*, 16 F.3d at 566, said:

> Yet, the evidence does not establish that the property has increased in value to compensate Carteret for the loss of its priority to First Fidelity. In the first place, continued construction based on projections and improvements to the property does not alone constitute adequate protection. [citation omitted] Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements. [Citing *In re O'Connor* and *In re 495 Central Park Avenue Corp.*] We reject the notion that development property is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable.

In this case, Acquvest will bear the entire risk of loss on the MAC financing and the debtors' scheme to develop and sell the Thornwood Property building lots. The risk in this speculative venture is obviously great. Acquvest is asked to underwrite this risk for the sole benefit of unsecured creditors and the debtors with no offsetting compensation or opportunity to benefit if the project is successful, and with no control whatever over the funding or the work. Not surprisingly, the courts have not endorsed similar requests. In *In re Chevy Devco*, 78 B.R. 585 (Bankr.C.D.Calif.1987), the Court stated:

> Is a senior lienor being given less than full protections so that a junior creditor or interest can benefit from it? If so, this subordination should not be allowed. (78 B.R. at 589)

> \* \* \* \* \* \*

In this case the secured creditor is being made to subordinate so that those with lower priority can potentially make a profit. This is not to be allowed.

Further, under the facts of this case the secured creditor is being treated as if it were an investor. It is being asked to risk its money on the hope that there is a profit to be made. If there is failure, the creditor has no protection against loss. But unlike an investor, the creditor will not share in the gain if the project is successful. The debtor wants the best of all worlds—to use this creditor's money without risk and to keep the profits for itself. (78 B.R. at 590)

The Third Circuit concluded the relevant portion of its opinion in *In re Swedeland Development Group, Inc.* as follows:

> We cannot close this portion of our opinion without pointing out that what happened here is quite disturbing. There, of course, is *no doubt that the policy underlying Chapter 11 is quite important.* Nevertheless, Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, be offered an *opportunity to recoup dependent upon the success of a business with inherently risky prospects.* We trust that in the future bankruptcy judges in this circuit will require that adequate protection be demonstrated more tangibly than was done in this case. (16 F.3d at 567)

For the reasons and under the authorities discussed above, the debtors' motion for superpriority financing under 11 U.S.C. § 364(d) is denied.

### Relief from Stay Under Section 362(d)

The foregoing analysis and ruling substantially resolves Acquvest's cross-motion under 11 U.S.C. § 362(d) for relief from the automatic stay. The motion is made under both subsections (1) and (2) of section 362(d). With respect to subsection (1), the lack of any equity cushion, the absence of evidence that the property is appreciating in value, the failure to make any payments on the loan since at least June 1993 and the fact that the debtors have no income or other funds with which to pay real estate taxes, which are currently in arrears, constitutes lack of adequate protection and "cause" for

relief from the stay. *See In re Nattchase Associates Ltd. Partnership,* 178 B.R. 409, 416 (Bankr.E.D.Va.1994) ("In this case, the parties have stipulated that there is no equity in the property. Nattchase has not made a regular payment to CMF in over five years, and has not paid real estate taxes since 1990. The Court finds this egregious behavior, and it is clear to us that CMF is not adequately protected, and that cause exists to grant relief under the Code."); *In re James River Associates,* 148 B.R. 790, 797 (E.D.Va.1992) [11] ("The bankruptcy court properly found that the diminishing equity cushion, the delinquent real estate taxes, the lack of payments on the Note since April 1991, and the deterioration of Equitable's security position under the priming lien constitute, both independently and together, a lack of adequate protection under 11 U.S.C. § 362(d)(1)"); *In re Carco Partnership,* 113 B.R. 735, 739 (Bankr. M.D.Fla.1990) (bankruptcy court concluded that secured creditor was not adequately protected for reasons including, among other things, the failure to pay past due real estate taxes and the inability to escrow taxes which had accrued nor those that would accrue). With regard to subsection (2), there is no dispute (A) that the debtors have no equity in the Thornwood Property and (B) that there is no possibility of reorganization in this case without post-petition financing to develop the Thornwood Property.

Accordingly, Acquvest's motion for relief from the stay is granted.

\* \* \*

The foregoing determinations render moot the other issues raised by the parties. Counsel for Acquvest will settle an order consistent with this decision.

[11]. Shephard's cites *In re James River Associates,* 156 B.R. 494 (E.D.Va.1993) as vacating 148 B.R. 790. In fact, the order reported at 156 B.R. 494 vacates a different decision.