808 F.2d 1393
 15 Bankr.Ct.Dec. 735, Bankr. L. Rep. P 71,571
 In re William Joseph O'CONNOR; and Jane Elizabeth O'Connor,
Debtors.
MBANK DALLAS, N.A., formerly known as Mercantile National
Bank At Dallas, Appellee,
v.
William Joseph O'CONNOR; and Jane Elizabeth O'Connor, Appellants.
 No. 85-2209.
 United States Court of Appeals,
Tenth Circuit.
 Jan. 12, 1987.
Rehearing Denied Feb. 4, 1987.
 
 Jack L. Kinzie and Bobbie T. Shell of Andrews Davis Legg Bixler Milsten & Murrah, Oklahoma City, Okl., for appellants.
 J. Maxwell Tucker of Winstead, McGuire, Sechrest & Minick, Dallas, Tex., for appellee.
 Before MOORE, ANDERSON and TACHA, Circuit Judges.
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed.R.App.P. 34(a); Tenth Cir.R. 10(e). The cause is thereby submitted without oral argument.
 
 
 2
 This is an appeal from a judgment of a district court sitting as an appellate court in bankruptcy. We have jurisdiction to consider this appeal under 28 U.S.C. Sec. 158(d).[1] The district court reversed an order which granted the Debtors' motion to use cash collateral pursuant to 11 U.S.C. Sec. 363 based upon a finding that the subject creditors were adequately protected. We hold that whether the Debtors have provided adequate protection is a question of fact which must be judged on the clearly erroneous standard. Since the district court failed to apply the correct standard of review, we reverse its judgment.
 
 
 3
 The controversy under consideration evolves from a voluntary petition for reorganization filed by Mr. William Joseph O'Connor and Mrs. Jane Elizabeth O'Connor, husband and wife, (Debtors) pursuant to Chapter 11 of the Bankruptcy Reform Act of 1978 (Code). During administration of the case, the Debtors sought leave from the bankruptcy court to use certain cash on deposit in a court-controlled bank account to drill 3 gas wells in areas previously leased by a limited partnership in which Mr. O'Connor was the general partner. To protect creditors claiming interests in the subject cash, Debtors offered replacement liens on the well proceeds and on other unencumbered regular monthly income received by Mr. O'Connor. MBank Dallas, N.A., (Bank) asserted a security interest in the cash and objected to the Debtors' proposal.
 
 
 4
 After notice and a hearing at which the bankruptcy court took evidence regarding the value of the revenue that would be generated by the drilling project and the prospects for success, as well as the value of the monthly income offered as an additional replacement lien, the court made findings of fact and concluded it would be in the best interest of the estate to grant the leave requested. The court further concluded that the Bank would be adequately protected by the replacement liens offered by the Debtors.
 
 
 5
 The Bank appealed this decision to the district court which set bond and stayed the use of the cash. The district court ultimately reversed the bankruptcy court, concluding the bankruptcy court erred in finding the Bank would be adequately protected. Relying upon Rader v. Boyd, 267 F.2d 911 (10th Cir.1959), the district court concluded that the replacement liens were too speculative to provide the adequate protection required by 11 U.S.C. Sec. 363(e).[2] The district court did not consider whether the findings of the bankruptcy court were clearly erroneous but simply ruled as a matter of law that Rader mandated reversal of the bankruptcy court.
 
 
 6
 The record indicates the Debtors had cash available from operations in the amount of $721,600. Since that cash represented proceeds from property on which the Bank claimed a security interest, it asserted the funds were subject to a proceeds lien and were "cash collateral" within the meaning of 11 U.S.C. Sec. 363. The record, however, discloses the Bank's exclusive claim to that collateral has been contested by another secured creditor in a companion proceeding. That creditor claims a mechanic's lien filed before perfection of the Bank's lien gives it priority over the Bank. Yet, for the sake of an expedient determination of the issue of adequate protection in the instant proceeding, neither the Debtors nor the other secured creditor have contested the nature and extent of the Bank's claim to the cash collateral. Notwithstanding, there is no question that the value of the lien held by the Bank for which adequate protection was sought could not exceed the amount of the money on deposit in the controlled account at the time the Debtors sought leave to use the cash collateral.[3]
 
 
 7
 At the hearing before the bankruptcy court, the Debtors offered evidence that in the area in which Debtors proposed to drill, Mr. O'Connor's limited partnership had 150 proven wells, 148 of which were still producing. Mr. O'Connor testified that the 3 proposed wells would be drilled "on the inside of what we have already established as producing wells, therefore putting the risk down to a very nominal level." He also testified that purchasers of the gas to be produced were already available and that there was presently a ready market for that gas which would extend well into the future. The Debtors' expert testified that future cash flow could be expected from the project in the sum of $6,774,862 and that the O'Connor share of that expectation was $5,284,392. In the opinion of the expert, the Debtors' interest, discounted to present value, was worth $3,674,071 at the time of the hearing. Although the Bank offered contrary evidence, the bankruptcy court rejected the Bank's assertions.
 
 
 8
 On the basis of the disputed evidence, the bankruptcy court found that "future net revenues attributable to Debtors' interest in the wells will be $5.2 million and that the present value of those revenues is in excess of $2.8 million." The court further found that Debtors had additional unencumbered property with "a present value of $10,000 per month." The bankruptcy court concluded that the Bank was adequately protected by the replacement liens in the properties having these values and, as a consequence, "granting the motion would be in the best interest of the estate and its creditors."
 
 
 9
 In its appeal to the district court and in its brief here, the Bank has advanced many reasons why the bankruptcy court reached the wrong decision but gives only passing treatment to the issue of consequence; that is, whether the bankruptcy court's findings are clearly erroneous. We have not considered the issue before, but we are convinced that whether a creditor is adequately protected is a question of fact.
 
 
 10
 In recognition of the powers created in bankruptcy law to adjust debts and creditors' interests, Congress realized the need to protect creditors from unfair treatment. Hence, it codified the concept of adequate protection into the several aggressive remedies available to debtors and bankruptcy trustees. See 2 Collier on Bankruptcy p 361.01 (15th ed. 1979). The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy.[4] House Rep. No. 95-595, 95th Cong., 2d Sess. 53, reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6295. In determining these values, the courts have considered "adequate protection" a concept which is to be decided flexibly on the proverbial "case-by-case" basis. In re Martin, 761 F.2d 472 (8th Cir.1985); In re Monroe Park, 17 B.R. 934 (D.C.Del.1982). Since "value" is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact. In re Martin, 761 F.2d at 472; In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017 (11th Cir.1984); In re Bank Hapoalim B.M., Chicago Branch v. E.L.I., Ltd., 42 B.R. 376 (D.C.N.D.Ill.1984); Brookfield Production Credit Association v. Borron, 36 B.R. 445 (D.C.E.D.Mo.1983), aff'd, 738 F.2d 951 (8th Cir.1984). As a question of fact, the bankruptcy court's determination that adequate protection exists or fails to exist can be reversed on appeal only if it is clearly erroneous. Fed.R.Bankr.P. 8013; International Brotherhood of Teamsters v. IML Freight, Inc., 789 F.2d 1460 (10th Cir.1986); Farmer's Co-op Ass'n of Talmage, Kan. v. Strunk, 671 F.2d 391 (10th Cir.1982). We have said that a clearly erroneous finding is one that leaves the reviewing court with the distinct and firm conviction that a mistake was made. State Distributors, Inc. v. Glenmore Distilleries, 738 F.2d 405 (10th Cir.1984). We are left with no such conviction here.
 
 
 11
 While the bankruptcy court had before it disputed facts, ample evidence supports its conclusion. Additionally, its judgment on the factual determinations is entitled to "due regard" on appeal. Fed.R.Bankr.P. 8013. Notwithstanding the Bank's argument that the Debtors' proposal was too speculative to provide adequate protection, the Bank bears the heavy burden of proving the bankruptcy court's contrary conclusion is clearly erroneous.
 
 
 12
 The question of adequacy was examined and decided by the bankruptcy court on disputed but sufficient evidence. Mr. O'Connor testified that the wells were going to be drilled in a proven area in which all his previous attempts had been successful. He explained that he had drilled 150 wells and all were still producing except for 2 which had experienced mechanical failure. In addition, Debtors' expert witness testified that ready buyers existed to buy the product of the proposed wells in a quantity to provide a cash flow more than sufficient to protect the Bank's proceeds lien.[5] Not only does this evidence support the bankruptcy court's conclusion that there was adequate protection, but it points out the very reason why Rader is inapposite here.
 
 
 13
 It must be remembered that the question of adequate protection is no longer confined to the conditions that exist at the time of confirmation as found in Rader. The use and definition of the concept of adequate protection has advanced beyond the scope of the term in the context of pre-Code bankruptcy laws in existence when Rader was decided. That change makes reliance upon older case law a treacherous adventure under the Code. 2 Collier on Bankruptcy p 361.01 (15th ed. 1979).
 
 
 14
 Rader dealt with the final treatment of the secured claim of a creditor in a Chapter XII arrangement proceeding under the Bankruptcy Act of 1898. That circumstance and its bearing upon the property rights and expectations of creditors are unlike the conditions presented in this case.
 
 
 15
 In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.
 
 
 16
 The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard. Martin, 761 F.2d at 476. In doing so, however, care must be exercised to insure that the vested property rights of the secured creditor and the values and risks bargained for by that creditor prior to bankruptcy are not detrimentally affected. Id.
 
 
 17
 Here, the creditor had a proceeds lien in cash worth $721,600. The Debtors proposed to use the cash thereby reducing the value of the creditor's security interest by $721,600, but in exchange, the Debtors proposed to give the creditor a new proceeds lien in property presently worth over five times that sum. The only distinction between the security interest the Bank had in the cash and the substitute security interest in the new wells is the risk inherent in drilling a dry hole.[6] Yet, the flexibility in judging whether that risk was significant or insignificant is what distinguishes this case from Rader.
 
 
 18
 The bankruptcy court found, in effect, that because the wells were to be drilled in proven areas, the risk to the Bank was not significant. That determination is supported by substantial evidence, and it is critical to the issue of adequate protection that exists in this case.
 
 
 19
 The Bank argued and continues to argue strenuously that granting the Debtors' motion was improper because the effect was contrary to the "reorganizational effect" of the plan it had proposed. The bankruptcy court found that the Bank's plan was nothing more than a program for liquidation of the Debtors' assets and concluded it was more appropriate at that stage of the proceedings to allow the Debtors an opportunity to reorganize. We agree with that conclusion.[7]
 
 
 20
 The judgment of the district court is REVERSED. The case is REMANDED for further proceedings to determine whether appellants' intend to assert a claim against the bond given in support of the stay order improvidently granted by the district court, and for further remand to the bankruptcy court for reinstitution of its order granting leave to use cash collateral.
 
 
 
 [1]
 Appellee MBank Dallas, N.A., suggests we do not have jurisdiction because the order of the district court was not final as it "merely dispos[ed] of an incidental matter regarding proceedings of the Bankruptcy Court...." The argument is unfounded. If the bankruptcy court's order was final for the purpose of MBank's appeal to the district court, the district court's order is final for the purpose of appeal to this court. Moreover, given the nature of bankruptcy proceedings and the appellate rights arising therefrom, an order of a district court reversing a bankruptcy court order is final unless the district court remands the case for "further significant proceedings." In re Commercial Contractors, 771 F.2d 1373, 1375 (10th Cir.1985). See also In re American Mariner Indus., Inc., 734 F.2d 426 (9th Cir.1984)
 
 
 [2]
 This section provides:
 Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used ... or proposed to be used ... by the trustee, the court ... shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest....
 For a statutory description of "adequate protection," see 11 U.S.C. Sec. 361.
 
 
 [3]
 This issue has not been addressed by the parties, but it is obvious that a proceeds lien of this nature could not have value beyond the actual amount of those proceeds. While the underlying debt and the value of the mortgages from which the proceeds lien stemmed were substantially larger than the cash on deposit, the Bank could only assert a right to protection for the amount of the money in that account which the Debtors sought to use, or $721,600
 
 
 [4]
 The district court held that "substitute collateral must constitute the 'indubitable equivalent' of the original collateral." (quoting In re Murel Holding Corp., 75 F.2d 941, 942 (2d Cir.1935)). While the indubitable equivalent concept of Murel was incorporated into the definition of adequate protection, it is not the exclusive means for accomplishing that end. See 2 Collier on Bankruptcy p 361.011 (15th ed. 1979). Indeed, 11 U.S.C. Sec. 361, which by its own terms is not exclusive, defines three means by which adequate protection can be provided. Moreover, 11 U.S.C. Sec. 361(2), which establishes the use of substitute liens, does not even employ the concept of the "indubitable equivalent."
 
 
 [5]
 Indeed, the need to protect a lien of $721,600 was offset by present values of more than $3.6 million
 
 
 [6]
 This risk is set off somewhat, however, by the additional substitute lien in the $10,000 per month income received by Mr. O'Connor. There is nothing in the record indicating this income is speculative, and its present worth is more than half the value of the cash collateral Debtors wanted to use
 
 
 [7]
 The Bank has offered other arguments we believe are without merit. First, their contention relative to the Debtors' interest in the lease upon which they proposed to drill is without merit because Mr. O'Connor is the general partner in the partnership which owned the lease. The fact that no title opinion was offered to support the evidence of his ownership interest goes merely to the weight of the evidence. Second, the Bank's argument that the bankruptcy court erred in its finding of adequacy is meritless because the concept of adequate protection extends, as we have already noted, to the value of the lien replaced and not to the whole amount of the underlying debt. Third, the Bank's argument that the court's finding of future value was based upon hearsay testimony is specious. That testimony came in by way of a deposition, and the reading of that deposition was agreed to by the Bank. The Bank attempted to reserve the right to object to specific questions and indeed did object to a question on the basis of hearsay. The hearsay asserted, quizzically enough, was that the witness had not been qualified as an expert. While that objection could be directed to the ability of the witness to assert conclusions, it hardly serves as a ground for a hearsay objection. Fourth, the Bank's assertion that the bankruptcy judge acted as a witness is equally specious. True enough, in his oral findings, the judge asserted a personal belief regarding one of the Bank's contentions, but that hardly serves to qualify him as a witness. Finally, the Bank asserts the replacement lien was invalid because it is already entitled to a proceeds lien in the gas produced from the new wells. That issue was not developed in the bankruptcy court and even were it not made problematic by 11 U.S.C. Sec. 552(b), we would not consider it properly before us