**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re:                                    )<br>                                           )<br>SONORA DESERT DAIRY, L.L.C.,               )<br>et al.,                                    )<br>                                           )<br>                    Debtors.               )<br>                                           )<br>_____        )<br>                                           )<br>WELLS FARGO BANK, N.A.,                     )<br>                                           )<br>                    Appellant,             )<br>                                           )<br>v.                                         )<br>                                           )<br>SONORA DESERT DAIRY, L.L.C.;                )<br>SONORA DESERT DAIRY II,                     )<br>L.L.C.; SONORA DESERT DAIRY                 )<br>III, L.L.C.; LUECK CATTLE                   )<br>COMPANY, L.L.C.; BOB LUECK                  )<br>FARMS, L.L.C.; AGSTAR                       )<br>FINANCIAL SERVICES, FLCA;                   )<br>OFFICIAL JOINT COMMITTEE OF                 )<br>UNSECURED CREDITORS,                        )<br>                                           )<br>                    Appellees.             )<br>_____        ) | BAP Nos.  AZ-13-1471-KiDJu<br>          AZ-13-1555-KiDJu<br>      (Consolidated Appeals)<br><br>Bk. Nos.  12-00262<br>          12-00263<br>          12-00264<br>          12-00265<br>          12;00266<br>      (Jointly Administered)<br><br><br>**M E M O R A N D U M**[1] |

Argued and Submitted on November 20, 2014,
at Phoenix, Arizona

Filed - January 5, 2015

Appeal from the United States Bankruptcy Court
for the District of Arizona

Honorable Randolph J. Haines, Bankruptcy Judge, Presiding

Appearances:     Robert J. Miller, Esq., of Bryan Cave LLP for
                 appellant; Michael S. Dove, Esq., of Gislason &
                 Hunter LLP for appellee AgStar Financial Services,
                 FCLA.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Before:  KIRSCHER, DUNN and JURY, Bankruptcy Judges.

Creditor Wells Fargo Bank, N.A. ("Wells Fargo") appeals: (1) an order authorizing a postpetition financing loan from creditor AgStar Financial Services, FLCA, as loan servicer and attorney-in-fact for First National Bank of Altus ("AgStar"); and (2) a supplemental order authorizing the debtors to receive additional postpetition advances from AgStar.  We VACATE and REMAND the first order; we AFFIRM the second order.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

**A.    The parties**

The debtors ("Debtors") consist of five entities[2] owned and operated by Robert Lueck ("Lueck"), a dairy farmer with 37 years of experience in the dairy business.  Debtors filed their chapter 11[3] bankruptcy cases on January 6, 2012, in response to Wells Fargo's assertion that it was going to seek the appointment of a receiver.

On the petition date, Debtors' assets consisted primarily of: (1) a 518 acre property on which Debtors conducted their dairy operations (the "Dairy Property"); (2) a 1,373 acre farm known as the Arlington Farm; and (3) a dairy herd of approximately 8,000

---

[2] The five debtors are:  Sonora Desert Dairy, L.L.C.; Sonora Desert Dairy II, L.L.C.; Sonora Desert Dairy III, L.L.C.; Lueck Cattle Company, L.L.C.; and Bob Lueck Farms, L.L.C.  The bankruptcy court ordered on January 12, 2012, that Debtors' cases be jointly administered.  Debtors' cases were substantively consolidated on May 7, 2012.  Debtors' chapter 11 cases were converted to chapter 7 on December 4, 2013.

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

-2-

animals, related feed inventory and milk production. In September 2010, an appraisal by AgStar valued the Arlington Farm at $13.7 million and the Dairy Property at $23 million (the "Debtors' Appraisal") for a total of $36.7 million.

AgStar and Wells Fargo comprise Debtors' two largest secured creditors. Debtors owed AgStar, their real estate lender, approximately $14.7 million as of the petition date (the "AgStar Prepetition Loan"). Debtors secured this loan by first liens on the Dairy Property and the Arlington Farm. Debtors owed Wells Fargo approximately $11.5 million on an operational revolving line of credit (the "Wells Fargo Prepetition Loan"). Debtors secured the Wells Fargo Prepetition Loan by Debtors' personal property, including the dairy herd, feed inventory and milk proceeds.

The United States Trustee appointed a creditors' committee ("Committee") consisting primarily of Debtors' feed suppliers, who asserted approximately $3.3 million in unsecured nonpriority claims.

Early in the cases, Debtors contended that the value of their assets exceeded $50 million and that all their prepetition secured and unsecured obligations totaled less than $27 million. Debtors expected to pay all creditors in full; Lueck expected to retain at least $20 million in equity.

**B.   The cash collateral orders**

In their first-day cash collateral motion, Debtors contended that as of the petition date the Dairy Property and Arlington Farm had a value no less than $36.7 million, based on Debtors' Appraisal and Lueck's opinion. Wells Fargo did not dispute these values. Debtors scheduled the Arlington Farm at a value of $15

million, but Debtors expected to sell it for $13-$14 million. Debtors further contended that the value of the dairy herd and feed inventory exceeded Wells Fargo's debt by $1 million. Lueck testified days later in response to Wells Fargo's motion to appoint an examiner[4] that the value of the dairy herd and feed inventory approximated $14.5 million, which exceeded Wells Fargo's debt. Debtors agreed to make monthly interest payments of $30,000 to Wells Fargo at the default contract rate.

The bankruptcy court entered a stipulated order on Debtors' first interim cash collateral motion on January 24, 2012. In exchange for use of its cash collateral, Debtors provided Wells Fargo a replacement lien for its prepetition collateral. A series of interim cash collateral motions followed; Wells Fargo objected to them. Given concerns with monthly losses in the value of Debtors' dairy herd and feed inventory during the pendency of the case, Wells Fargo contended that its collateral suffered diminution in value since the petition date.[5]

The bankruptcy court issued at least sixteen interim cash collateral orders. Beginning with the second interim order and in subsequent interim orders, the bankruptcy court imposed a

---

[4] Eleven days into the bankruptcy cases, Wells Fargo filed a motion to appoint an examiner, which eventually became an alternative motion to appoint a trustee. Debtors and the Committee opposed it. After a three-day evidentiary hearing on March 22, 28 and 29, 2012, the bankruptcy court denied Wells Fargo's motion on May 8, 2012.

[5] Wells Fargo also initially accused Lueck of conducting "cull" sales of cattle and failing to tender all of the sale proceeds to Wells Fargo, a claim that was later determined to be unfounded. A "cull" sale is a routine sale of ill, aged or nonproductive cows.

-4-

replacement lien for its prepetition collateral and junior liens on Debtors' real property for the benefit of Wells Fargo, which served as adequate protection for the Wells Fargo Prepetition Loan. Despite any losses in the prepetition collateral, Debtors asserted that the junior liens on Debtors' real property adequately protected Wells Fargo. The orders entered after the bankruptcy court approved the Wells Fargo DIP loan, discussed more thoroughly below, also allowed for the priming of AgStar's senior lien on Debtors' real property, giving Wells Fargo a $500,000 superpriority lien.

## C. Debtors' proposed chapter 11 plans

Meanwhile, Debtors filed their initial chapter 11 plan and disclosure statement on March 21, 2012. Debtors' plan proposed to implement the orderly sales of the Arlington Farm, the Dairy Property and other assets Debtors used in their business operations, including the dairy herd, feed inventory and various equipment. Debtors opposed Wells Fargo's alleged desire to "fire sale" the dairy herd, contending it would result in significantly less funds for the estate. Debtors intended to continue operating the dairy farm until a suitable buyer could be found and a sale of the Dairy Property could be completed as a going concern. A working dairy farm may be more valuable than a nonoperational or "dark" one. Debtors asserted that the proceeds realized from the sale of the Arlington Farm, the Dairy Property and other operating assets would be sufficient to pay off the AgStar Prepetition Loan, the Wells Fargo Prepetition Loan and other secured creditors; the remaining proceeds would pay all of the allowed unsecured claims. In March 2012, Debtors expected over a six-to-nine month period to

-5-

sell the Arlington Farm for between $10-$12 million (as opposed to the original $13-$14 million figure) and to sell the Dairy Property for between $20-$25 million.[6]

Ultimately, the Arlington Farm sold at auction for $8.425 million on August 9, 2012. From these proceeds, AgStar received $7.8 million and credited it to its debt of approximately $14.9 million; Wells Fargo received nothing. Wells Fargo now would have to look to the Dairy Property for adequate protection should the Wells Fargo Prepetition Loan not be satisfied by the prepetition collateral plus the replacements liens.

Debtors filed their first amended chapter 11 plan and disclosure statement on June 4, 2012. Debtors contended for the first time that the Wells Fargo Prepetition Loan was undersecured by between $1.4 and $5.95 million as of the petition date.[7] Debtors' Broker estimated that if operations ceased and the Dairy Property went "dark," its value would decline by at least 20% or a minimum of $5,000,000, based on a sale price between $20-$25 million. Thus, Debtors' projected losses of $875,000 during the summer months were far less than the $5,000,000 reduction that would be realized if the Dairy Property were sold "dark." Debtors

---

[6] Debtors' real estate broker Charles Havranek ("Broker") confirmed these numbers at the March 29, 2012 evidentiary hearing on Wells Fargo's motion to appoint an examiner or trustee. Larry Clayton, the Wells Fargo employee in charge of the Wells Fargo Prepetition Loan, testified that he agreed with the Broker's figures, which totaled $30 million for the two properties on the low end.

[7] Debtors clarified in their ninth interim cash collateral motion that Wells Fargo was undersecured by at least $1,491,000 or as much as $5,684,367, based on Wells Fargo's own internal inspection conducted on January 4, 2012, just two days prior to the petition date.

ultimately withdrew their first amended plan.

**D.    Wells Fargo's first motion for relief from stay**

Wells Fargo moved for relief from stay with respect to the dairy herd on June 28, 2012.  After several postpetition sales of portions of the dairy herd, Debtors still owed Wells Fargo approximately $10.3 million.  Wells Fargo argued that since the petition date, the dairy herd and feed inventory had declined in value by approximately $2.0 million, from $11.2 million to $9.2 million and it expected more losses.  Wells Fargo disputed the Broker's opinion that the Dairy Property would be devalued by as much as $5 million if the dairy were shut down and the herd sold, leaving the real property and improvements to be sold alone.  The Broker had admitted at deposition that he did no analysis to support this opinion and had no meaningful experience in this factual situation.  Further, argued Wells Fargo, Debtors' position that the Dairy Property and Arlington Farm had sufficient value to cover all secured claims was disingenuous.  Wells Fargo's recent appraisal of the two properties valued them at only $27.5 million. Thus, if foreclosure of the properties occurred, Wells Fargo's interest possibly would be wiped out.  Wells Fargo disputed Debtors' position that it was undersecured by as much as $5.95 million on the petition date.

Debtors and the Committee opposed Wells Fargo's stay relief motion, contending that Wells Fargo was adequately protected with the replacement lien and junior liens on Debtors' real properties, and that the loss of the dairy herd would unnecessarily result in a reduction of the value of Debtors' assets.

The bankruptcy court denied Wells Fargo's request for stay

-7-

relief on November 9, 2012, on the basis that it was adequately protected. At the hearing on November 5, 2012, the bankruptcy court pointed to Wells Fargo's appraisal valuing the Dairy Property at $21 million, which was consistent with Debtors' Appraisal. Based on the parties' estimates on the sale of the dairy herd and feed inventory at between $4.9 and $7.3 million and Wells Fargo's debt of $10 million, the court calculated that a sale of the collateral would leave Wells Fargo with a deficit of between $2.7 and $5.1 million. Subtracting out AgStar's remaining senior debt of $8 million, a sale of the Dairy Property for $21 million would leave approximately $13 million in equity for Wells Fargo and other creditors. So, worst case scenario, Wells Fargo had an equity cushion of 39%.

However, to protect Wells Fargo's interest in its collateral, the court ordered that: (1) Wells Fargo be given a valid and perfected junior lien in the Dairy Property; (2) the Dairy Property be sold by March 31, 2013, and if no sale was completed by that date, then (i) Debtors had to begin selling the dairy herd on April 1, 2013, to be completed by May 15, 2013, and pay all proceeds to Wells Fargo, who had the right to object and credit bid, and (ii) Wells Fargo would have stay relief as to the dairy herd effective May 15, 2013.

**E.    AgStar's first DIP motion; Wells Fargo's DIP loan and the Final DIP order**

Meanwhile, on July 18, 2012, Debtors filed their motion for an order: (1) authorizing postpetition financing from AgStar on a secured basis; (2) compromising and restructuring AgStar's debt under Rule 9019; and (3) granting AgStar relief from stay ("First

-8-

AgStar DIP Motion"). In short, Debtors sought a $1 million postpetition line of credit from AgStar, secured by a priming lien on the Arlington Farm and Dairy Property. The terms of the proposed DIP loan included an interest rate of 7% and a $10,000 origination fee. Debtors argued that even with a $1 million priming lien to AgStar, both AgStar and Wells Fargo were adequately protected by a substantial equity cushion, based on an approximate value of the Arlington Farm and Dairy Property at $33.5 million.

Wells Fargo opposed the First AgStar DIP Motion. Although concerned with the increasing decline in the value of the dairy herd and feed inventory since the petition date, Wells Fargo offered to provide Debtors with a $ 1 million DIP loan, secured by a superpriority priming lien on the Dairy Property. Wells Fargo offered 6% interest and no origination fee. The initial July 30 hearing on the First AgStar DIP Motion was continued to August 16, 2012, then continued again to November 5 and November 8 for an evidentiary hearing.

Prior to the August 16 hearing, Wells Fargo filed a supplemental brief, which included the detailed terms for Wells Fargo's proposed DIP loan. Wells Fargo explained that it had been forced to negotiate its DIP loan with the Committee rather than Debtors, because it was Debtors' and AgStar's position that Wells Fargo was not entitled to have private negotiations with Debtors. Wells Fargo believed the economic terms of its proposed DIP loan were better than AgStar's.

Debtors filed a supplemental declaration from Lueck. Despite Wells Fargo's offer, Lueck continued to believe that AgStar's

proposed financing was in the best interest of creditors. Wells Fargo's conditional requirement to sell the dairy herd by December 31, 2012, whether or not the Dairy Property had been sold, concerned Lueck. Lueck believed a forced liquidation of the herd would impair the value of the Dairy Property and would only benefit Wells Fargo. Lueck further declared that he did not trust Wells Fargo to actually provide the funds.

At the November 5 evidentiary hearing on the First AgStar DIP Motion, the bankruptcy court expressed its concern that although Wells Fargo had proposed a DIP loan, no motion had been filed. Further, circumstances had changed — i.e., the Arlington Farm had been sold — so AgStar's proposed DIP loan terms were outdated. The court was also concerned with Debtors' failure to negotiate in good faith with Wells Fargo. If competing DIP loans were put before it, the court stated it would choose which one benefitted Debtors; the constant fighting between the parties would no longer be tolerated.

The court and parties further discussed the details of AgStar's revised DIP loan terms and Wells Fargo's proposed DIP loan terms at a continued hearing on November 8, 2012. Ultimately, the bankruptcy court approved the DIP loan proposed by Wells Fargo (the "DIP Loan") and denied approval of the First AgStar DIP Motion. Although the court expressed its reluctance to authorize the priming of AgStar's senior lien, it concluded the "very sufficient adequate protection" supported priming. The bankruptcy court overruled AgStar's due process and notice objections regarding the priming of its lien.

The bankruptcy court entered an interim order approving

-10-

Debtors' continued use of cash collateral and approving the DIP Loan for $500,000 on November 9, 2012. Wells Fargo received, in addition to the junior lien on the Dairy Property for its prepetition debt, a priming lien senior to that of AgStar's lien on the Dairy Property and of any administrative expenses — i.e., a superpriority lien — in exchange for the DIP funds. Wells Fargo's priming lien could not be made subordinate to, or made pari passu with, any other lien under § 364(d). In addition, so long as the DIP Loan remained outstanding, the interim order prohibited Debtors: from granting any liens on all postpetition collateral (the Dairy Property, insurance proceeds, cash proceeds, products, rents, etc.) senior or equal to the DIP lien of Wells Fargo; and from using any cash collateral of Wells Fargo or any proceeds from the DIP Loan for purposes other than those set forth in the budget agreed to by the parties. The bankruptcy court held a hearing for a final DIP order on November 26, 2012, overruled AgStar's and Debtors objections and entered a final order on November 29, 2012 ("Final DIP Order"). Debtors ultimately drew the entire $500,000 in available funds from the DIP Loan.

**F.    Debtors' multiple cattle sales**

Over the course of the next few months and pursuant to the conditional stay relief granted to Wells Fargo with respect to the dairy herd, Debtors filed multiple motions to sell portions of the dairy herd under § 363(f). The sale motions were either granted over Wells Fargo's objection or stipulated to by Wells Fargo. Wells Fargo received all sale proceeds.

**G.    AgStar's motion for relief from stay**

On May 9, 2013, AgStar moved for relief from stay under

-11-

§ 362(d)(1) and (d)(2) to foreclose on the Dairy Property. By that time, Debtors owed approximately $7.4 million on the AgStar Prepetition Loan, which was junior to Wells Fargo's DIP lien and senior to Wells Fargo's junior lien on the Dairy Property. The Dairy Property had initially been listed for $27 million, then reduced to $20 million, then reduced again to $16 million. The total liens on the property approximated $15.4 million. Because the remaining dairy herd would soon be liquidated pursuant to the stay relief granted to Wells Fargo, AgStar contended the Dairy Property would decline another 10%-20% in value once it went dark. Broker costs amounted to $240,000 based on a sale price of $16 million. Thus, argued AgStar, relief from stay was warranted as little, if any, equity was available in the Dairy Property.

AgStar also revealed for the first time that it had conducted an appraisal of the Dairy Property in June 2012; it was valued at $15.5 million. Debtors' water rights were valued at $750,000.

**H.   Wells Fargo's second motion for relief from stay**

Wells Fargo moved for relief from stay again on May 31, 2013. By this time, Debtors had sold the entire dairy herd and paid all proceeds to Wells Fargo. Wells Fargo contended that Debtors had incurred losses of more than $4.8 million in their dairy operations since the petition date, severely diminishing the bank's cash, herd, feed and other collateral. Wells Fargo contended that based on Debtors' figures in their April operating reports, the Wells Fargo Prepetition Loan exceeded the value of Debtors' remaining personal property (equipment, etc.) by $210,000. Thus, argued Wells Fargo, it was entitled to stay relief as to the personal property under § 362(d)(1) and (d)(2).

-12-

AgStar opposed Wells Fargo's second stay relief motion. In short, AgStar argued that because the purpose of the DIP Loan was to provide monies for Debtors' ongoing operations and the monies at issue were generated from Debtors' dairy operations, then those monies should be used to pay back the DIP Loan. AgStar argued that Wells Fargo's attempt to apply all existing monies to its prepetition debt severely prejudiced AgStar and provided a windfall to Wells Fargo by allowing its $500,000 priming lien to remain intact.

**I.    AgStar's second DIP motion and related DIP order - the basis of Wells Fargo's first appeal**

As of May 30, 2013, Debtors owed Wells Fargo approximately $6 million, including the $500,000 DIP Loan. On June 6, 2013, Debtors tendered a payment of $516,826.97 to Wells Fargo to satisfy the DIP Loan and a payment of $239,006.34 to be applied to the Wells Fargo Prepetition Loan.

Just days later on June 12, 2013, Debtors filed a motion to: (1) authorize a DIP loan from AgStar for $315,000 for winding down purposes (the "AgStar DIP Loan"); (2) grant AgStar and Wells Fargo conditional relief from stay; (3) authorize the sale of the Dairy Property under § 363(f); (4) approve the bidding procedures for the Dairy Property; (5) set the date for the auction; and (6) grant other related relief (the "Second AgStar DIP Motion"). As for the proposed AgStar DIP Loan, AgStar agreed to fund Debtors' operation through November 8, 2013, pursuant to an agreed wind down budget. In exchange, AgStar would be given a priming lien on the Dairy Property (including all insurance proceeds, cash proceeds, products, rents, etc.) senior to that of Wells Fargo's

-13-

DIP lien. To obtain the DIP financing from AgStar, Debtors were required to first pay off Wells Fargo's DIP Loan and satisfy the priming lien. AgStar's DIP lien could not be subordinate to, or made pari passu with, any other lien under § 364(d). Debtors argued that giving AgStar a priming lien over Wells Fargo was warranted because both AgStar and Wells Fargo were adequately protected based on the equity cushion in the Dairy Property.

As for the sale of the Dairy Property, Debtors sought authorization to auction it on October 4, 2013. Should the Dairy Property not sell at auction, AgStar and Wells Fargo would be granted stay relief to foreclose on the property after December 2, 2013.

Wells Fargo opposed the Second AgStar DIP Motion.[8] It argued that under the Final DIP Order, which was never appealed, Debtors were not allowed to use any of its cash collateral or proceeds from the DIP Loan for any other purpose than what was agreed to in Debtors' budget, unless they had prior written consent from Wells Fargo; repaying its DIP Loan was not an allowed use and Wells Fargo did not consent. In Wells Fargo's opinion, Debtors were attempting to use collateral for a loan for which a significant repayment risk existed (the Wells Fargo Prepetition Loan) to repay a loan for which minimal repayment risk existed (the DIP Loan). Wells Fargo argued that no adequate protection could exist under those circumstances.

Wells Fargo further argued that the Final DIP Order

---

[8] Wells Fargo also agreed to provide Debtors with additional DIP financing, but Debtors contended the terms were less favorable.

-14-

prohibited Debtors from obtaining DIP financing and granting any liens on the prepetition collateral or the postpetition collateral (including the Dairy Property) senior to, or on parity with, Wells Fargo's DIP lien. Despite Debtors' intent to pay off the DIP Loan with its tender of $516,000, Wells Fargo refused to apply it as such and placed the money into escrow pending resolution of the dispute. Thus, because the DIP lien was still outstanding, argued Wells Fargo, Debtors could not grant AgStar a senior lien. Wells Fargo did not oppose, generally, the sale of the Dairy Property.

A hearing on the Second AgStar DIP Motion was held on June 26, 2013. Wells Fargo reiterated its objection to Debtors using the milk proceeds, which secured the Wells Fargo Prepetition Loan, to pay off the DIP Loan. In response, the bankruptcy court inquired why the pay off of the DIP Loan was not, dollar for dollar, adequate protection for Wells Fargo; it eliminated a priority lien that was a lien against all of Wells Fargo's prepetition collateral. Counsel replied that the $500,000 in milk proceeds was cash collateral and the security for Wells Fargo's prepetition debt; the priming DIP lien was secured by the Dairy Property only, not all of Wells Fargo's prepetition collateral. When the court asked counsel why Debtors could not pay off the DIP Loan with the milk proceeds, counsel stated that Debtors could pay off the DIP Loan with the sale proceeds from the Dairy Property; Debtors could not use the cash collateral that secured Wells Fargo's prepetition debt to pay the postpetition debt obligation or they were not adequately protected. The court disagreed and countered that all Debtors had to show was that Wells Fargo was adequately protected for this particular use of cash collateral,

-15-

not that Wells Fargo would never incur a loss on its prepetition debt. In other words, Debtors had to demonstrate that this use of cash collateral — to pay off the DIP Loan — would not cause greater loss to Wells Fargo. Since the cash was being used to pay down a lien that otherwise was senior to the Wells Fargo Prepetition Loan, the court could not see how that use of cash collateral created a greater loss to Wells Fargo. Counsel then referred back to the Final DIP Order, which expressly set forth the uses for the cash collateral; paying off the DIP Loan was not an approved use.

After further discussion, and in absence of any contrary authority cited by counsel for Wells Fargo, the bankruptcy court ruled:

> The debtor may use cash collateral to pay Wells Fargo and since the general common law rule is a voluntary payor has the right and power to designate how any payment shall be applied, debtor also has the right and power to designate that upon turning this cash collateral over to Wells Fargo it shall be applied to the DIP [L]oan.

Hr'g Tr. 19:18-23, June 26, 2013. The bankruptcy court further found "as a matter of law" that Debtors' use of the $516,000 in cash collateral to pay off the DIP Loan was adequate protection for the Wells Fargo Prepetition Loan. Accordingly, the Second AgStar DIP Motion was granted. Based on the court's ruling, Wells Fargo's objection as to the priming of its DIP lien by the AgStar DIP lien was overruled.

The bankruptcy court entered an order granting the Second AgStar DIP Motion on July 12, 2013 (the "AgStar DIP Order"). The court: ordered Wells Fargo to apply the funds received to the DIP Loan and to release its priming lien on the Dairy Property; gave

-16-

AgStar a priming lien in the amount of $315,000 over its own senior lien on the Dairy Property; and declared that AgStar's DIP lien could not be made subordinate to, or made pari passu with, any other lien under § 364(d). The court found AgStar to be a good faith lender entitled to the protections of § 364(e). An auction to sell the Dairy Property was to occur on October 4, 2013, but in the event it did not sell, AgStar and Wells Fargo were granted stay relief to foreclose on the property after December 2, 2013. The AgStar DIP Order contemplated that other issues raised in the Second AgStar DIP Motion would be decided at a later hearing.

Wells Fargo timely moved to amend the AgStar DIP Order on July 19, 2013. In short, Wells Fargo contended that the AgStar DIP Order, in its form lodged unilaterally by Debtors and signed by the bankruptcy court, contained language contrary to the court's oral ruling with respect to the proposed sale terms of the Dairy Property and to what matters were reserved for further hearing.

The bankruptcy court entered a minute entry on September 10, 2013, granting Wells Fargo's motion to amend. The minute entry also noted that a status hearing on further DIP financing was to be held on November 7, 2013, unless the parties notified the court that no hearing would be necessary. Now that the AgStar DIP Order was final, Wells Fargo timely filed its notice of appeal on September 24, 2013. The October 4 auction for the Dairy Property never took place.

//

//

**J.    The supplemental AgStar DIP order - the basis for Wells Fargo's second appeal**

On November 6, 2013, Debtors filed a Notice of Lodging Proposed Stipulated Order Regarding Postpetition Financing. In the attached stipulated order entered into by Debtors and AgStar, Debtors stated that they had drawn approximately $144,000 of the $315,000 authorized in the AgStar DIP Order entered on July 12, 2013. Debtors were in immediate need of additional funds to maintain the Dairy Property until the foreclosure sale scheduled for December 6, 2013, which required an additional draw on the remaining funds in the AgStar DIP Loan but no additional loan beyond the $315,000 previously authorized. In addition to the existing priming DIP lien authorized on July 12, the bankruptcy court granted AgStar a replacement lien for the AgStar Prepetition Loan on the Dairy Property, which was to be senior to any other liens on the property (excluding the taxing authority's lien).

In light of the stipulation filed, the bankruptcy court vacated the status hearing for further DIP financing scheduled for November 7, 2013, and entered Debtors' and AgStar's stipulated financing order as proposed on November 7, 2013 (the "Supplemental AgStar DIP Order"). Wells Fargo timely filed its notice of appeal on November 14, 2013.

The Panel issued an order consolidating Wells Fargo's appeals of the AgStar DIP Order and the Supplemental AgStar DIP Order on January 21, 2014.

**K.    Debtors' cases get converted to chapter 7 and Dairy Property is foreclosed**

The Committee moved to convert Debtors' cases to chapter 7 on

-18-

November 19, 2013. In short, the foreclosure sale of the Dairy Property set for December 6, 2013, was expected to yield only enough funds to pay AgStar; no proceeds would be available for any junior lienholders, administrative claimants or the unsecured creditors. Therefore, because no possibility existed for rehabilitation, the Committee argued that conversion was in the best interest of creditors.

AgStar filed a limited objection to the Committee's conversion motion, requesting only that the cases not be converted until after the foreclosure sale of the Dairy Property. AgStar believed that insufficient funds would be available from the foreclosure sale to pay the AgStar Prepetition Loan, the AgStar DIP Loan and the additional funds authorized in the Supplemental AgStar DIP Order, much less for anyone else's claims.

After a hearing on December 2, 2013, the bankruptcy court ordered that Debtors' cases be converted to chapter 7, effective December 10, 2013, after the foreclosure sale of the Dairy Property on December 6.

A third-party bidder purchased the Dairy Property for $6,936,264.02; one dollar more than AgStar's opening credit bid. AgStar purchased Debtors' water rights through its credit bid for $999,999.00. Wells Fargo's junior lien on the Dairy Property was extinguished, leaving approximately $5 million of the Wells Fargo Prepetition Loan left unpaid.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(D) and (M). We discuss our jurisdiction below.

//

-19-

# III. ISSUES

1.   Are the appeals moot?

2.   Did the bankruptcy court err when it ordered Wells Fargo to apply its cash collateral to the DIP Loan and that its DIP lien was deemed satisfied?

3.   Did the bankruptcy court violate Wells Fargo's due process rights when it entered the Supplemental AgStar DIP Order?

# IV. STANDARDS OF REVIEW

We review a bankruptcy court's conclusions of law de novo and its factual findings for clear error. Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.), 503 F.3d 933, 940 (9th Cir. 2007). An adequate protection determination and an authorization to use cash collateral are factual issues reviewed for clear error. See Martin v. United States (In re Martin), 761 F.2d 472, 478 (8th Cir. 1985). Factual findings are clearly erroneous if illogical, implausible or without support in the record. Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).

Whether the bankruptcy court's procedures comport with due process is a question of law reviewed de novo. Price v. Lehtinen (In re Lehtinen), 564 F.3d 1052, 1058 (9th Cir. 2009); Garner v. Shier (In re Garner), 246 B.R. 617, 619 (9th Cir. BAP 2000).

# V. DISCUSSION[9]

## A.   The appeals are not moot.

On April 23, 2014, a motions panel denied AgStar's motion to

---

[9] On November 13, 2014, appellant filed a statement of additional authorities and asked this Panel to consider such authorities. We conclude further consideration of such authorities is unnecessary given the analysis in this memorandum.

-20-

dismiss the appeals as moot, determining that effective relief remained available. AgStar asks the merits panel to reconsider that decision, contending that it has met its heavy burden to demonstrate the appeals are moot. See Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 880 (9th Cir. 2012). Despite the motions panel ruling, we have an independent duty to determine whether appellate jurisdiction exists. Dannenberg v. Software Toolworks, Inc., 16 F.3d 1073, 1074 n.1 (9th Cir. 2004). We lack jurisdiction to decide moot appeals. United States v. Pattullo (In re Pattullo), 271 F.3d 898, 900 (9th Cir. 2001). If an appeal becomes moot while it is pending before the Panel, we must dismiss it. Id. Therefore, we will consider AgStar's request.

AgStar merely rehashes the same arguments raised before the motions panel and offers no new grounds for reconsideration. Nonetheless, AgStar contends the appeals are equitably moot because: (1) Wells Fargo failed to obtain a stay pending appeal; (2) the Dairy Property has been sold to a third party; and (3) we cannot fashion effective relief. Failure to seek a stay can render an appeal equitably moot. In re Thorpe Insulation Co., 677 F.3d at 881 ("We will first look at whether a stay was sought, for absent that a party has not fully pursued its rights.")(citing In re Roberts Farms, 652 F.2d 793, 797-98 (9th Cir. 1981)). For an appeal to be equitably moot, "[t]he question is whether the case 'presents transactions that are so complex or difficult to unwind that the doctrine of equitable mootness would apply.'" Id. at 880 (quoting Lowenschuss v. Selnick (In re Lowenschuss), 170 F.3d 923, 933 (9th Cir. 1999)). "Ultimately, the decision

-21-

whether or not to unscramble the eggs turns on what is practical and equitable." Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.), 35 F.3d 1348, 1352 (9th Cir. 1994) (citations omitted).

Wells Fargo failed to seek a stay of the AgStar DIP Order or the Supplemental AgStar DIP Order. Under Thorpe, that alone may be enough to render these appeals equitably moot. See also Stokes v. Gardner, 2012 WL 1944552 (9th Cir. May 30, 2012)(citing Thorpe and stating that failure to seek a stay may, "by itself," render a party's claim equitably moot). Nevertheless, the sale of the Dairy Property to a third party does not preclude us from fashioning effective relief for Wells Fargo. AgStar can be ordered to pay an appropriate portion of the sale proceeds to Wells Fargo, should we determine Wells Fargo is entitled to any. Further, such relief would not require the unwinding of the Dairy Property sale or have any effect on the third party not before us. Thus, the third party's absence in these appeals is of no moment. See In re Thorpe Insulation Co., 677 F.3d at 881.

We further conclude, although not raised by AgStar, the appeal of the AgStar DIP Order is not statutorily moot under § 364(e).[10] Under that provision, if the bankruptcy court found

---

[10] Section 364(e) provides:

The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were
(continued...)

-22-

that the lender acted in good faith in extending the postpetition loan, a reversal or modification of the unstayed financing order on appeal does not affect the validity of the creditor's loan or any liens or priorities securing the loan.  § 364(e); Credit Alliance Corp. v. Dunning-Ray Ins. Agency, Inc. (In re Blumer), 66 B.R. 109, 113 (9th Cir. BAP 1986).

The AgStar DIP Order does contain a boilerplate "good faith" finding; Wells Fargo has not made any allegations of bad faith.[11] However, it does not follow that we must dismiss that appeal as statutorily moot.  Section 364(e) does not restrict us from reviewing central questions to the AgStar DIP Order:  whether the bankruptcy court provided Wells Fargo with adequate protection and whether the court violated Wells Fargo's due process rights.  See Desert Fire Prot. v. Fontainebleau Las Vegas Holdings, LLC (In re Fontainebleau Las Vegas Holdings, LLC), 434 B.R. 716, 746 (S.D. Fla. 2010)(if existing lienholder did not receive adequate protection for the priming lien, the court is not forbidden from granting the lienholder effective relief)(citing 3 COLLIER ON BANKRUPTCY ¶ 364.06[2] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2010)); In re Blumer, 66 B.R. at 113 (although lenders satisfied good faith requirement of § 364(e), the appeal was not moot because the court's order violated appellant's due process rights).

---

[10](...continued)
stayed pending appeal.

[11] No "good faith" finding was made in the Supplemental AgStar DIP Order, so it does not appear to be subject to the protections of § 364(e).

-23-

Accordingly, we see no impediment to providing Wells Fargo with effective relief. Thus, the appeals are not moot; we have jurisdiction under 28 U.S.C. § 158.

**B.    The bankruptcy court erred when it ordered Wells Fargo to apply the $516,000 payment to its DIP Loan and deemed Wells Fargo's DIP lien satisfied.**

**1.    Governing law**

To obtain DIP financing that involves a senior or "priming" lien on encumbered property, the debtor-in-possession must show that (1) it was unable to obtain credit without granting such liens and (2) the value of the prepetition lender's lien that will be primed by the DIP lender's lien is adequately protected. See § 364(d)(1). The debtor bears the burden of proof on the issue of adequate protection. See § 364(d)(2).[12] The purpose of the adequate protection requirement under § 364(d) is to protect an existing lienholder from any decrease in the value of its security interest resulting from the priming lien. In other words, adequate protection is provided to ensure that the prepetition creditor receives the value for which the creditor bargained prebankruptcy. MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); In re Mosello, 195 B.R. 277,

---

[12] Section 364(d)(1) and (2) provides:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
    (A) the trustee is unable to obtain such credit otherwise; and
    (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

-24-

288 (Bankr. S.D.N.Y. 1996).

Adequate protection may be provided by (1) periodic cash payments, (2) additional or replacement liens or (3) other relief resulting in the "indubitable equivalent" of the secured creditor's interest. In re Stoney Creek Techs., LLC, 364 B.R. 882, 890 (Bankr. E.D. Pa. 2007)(citing § 361). In addition, the requirement to provide adequate protection can be met by showing the existing lienholder is oversecured with a substantial equity cushion. See Pistole v. Mellor (In re Mellor), 734 F.2d 1396, 1400 (9th Cir. 1984). What constitutes adequate protection is to be decided flexibly on a case-by-case basis. In re O'Connor, 808 F.2d at 1396-97.

**2.   Analysis**

In analyzing the issues in this appeal, the Panel distinguishes Wells Fargo's role as a prepetition secured creditor from its role as a DIP lender and the corresponding differences between the collateral used to secure both debts. Thus, the collateral securing each debt requires specific identification and Wells Fargo's distinguishing roles associated with the two debts warrant a different calculus.

Wells Fargo contends the bankruptcy court erred when it forced Wells Fargo to apply the milk proceeds, which provided security for the Wells Fargo Prepetition Loan, to satisfy the DIP Loan, and it further erred in determining "as a matter of law" that using the milk proceeds to pay off the DIP Loan constituted adequate protection on a dollar-for-dollar basis. Wells Fargo also contends the bankruptcy court violated the "law of the case doctrine" by allowing Debtors to use cash collateral in a manner

that was expressly prohibited in the Final DIP Order.

Paragraph 5 of the Final DIP Order provides that Wells Fargo will receive, in addition to the junior lien it already had on the Dairy Property, a lien on "any and all assets acquired by the Debtors after the Petition Date of the same type as the assets on which Wells Fargo held a lien on the Petition Date." In re Sonora Desert Dairy, LLC, No. 2:12-00262, slip order at 7 (Bankr. D. Ariz. Nov. 29, 2013). Thus, Debtors extended Wells Fargo's security interest in all personal property they acquired postpetition that was of the same type on which Wells Fargo held a security interest prepetition — i.e., the dairy herd, feed inventory and milk proceeds – to secure the Wells Fargo Prepetition Loan. Paragraph 6 of the Final DIP Order provides that the Dairy Property was the collateral securing the DIP Loan, and that Wells Fargo's DIP lien would be senior to or "prime" AgStar's senior lien on the Dairy Property. Id. In addition, Paragraph 1 provides that Debtors could only use any cash collateral of Wells Fargo in the manner set forth in the parties' agreed budget attached to the Final DIP Order. Id. at 5-6. Neither the budget nor the Final DIP Order contemplate that Debtors could use milk proceeds securing the Wells Fargo Prepetition Loan to pay off the DIP Loan secured by the Dairy Property.

In reviewing the transcript from the hearing on the Second AgStar DIP Motion, we conclude that Wells Fargo and the bankruptcy court misunderstood each other's positions. The court mistakenly assumed that Wells Fargo's DIP Loan was secured by all of Wells Fargo's prepetition collateral (the dairy herd, feed inventory and

-26-

milk proceeds) in addition to the Dairy Property, despite counsel's statements to the contrary and his citation to Paragraph 6 of the Final DIP Order. In other words, the court believed all of Wells Fargo's collateral, pre- and postpetition, provided security for the DIP Loan.[13] On that assumption, it would follow that whether Wells Fargo applied the $516,000 cash payment to its DIP Loan or the Wells Fargo Prepetition Loan would make no difference; Wells Fargo was receiving its money either way. It would also follow under those facts that because the DIP Loan was being paid in full, Wells Fargo was receiving dollar-for-dollar adequate protection, and thus the AgStar DIP Loan and priming lien could be authorized under § 364(d).

However, applying the $516,000 payment to the DIP Loan did make a difference; it caused Wells Fargo to lose $516,000 it would have otherwise been able to recover from the sale of the Dairy Property. Put simply, had Wells Fargo's priming lien remained intact, it would have been paid its $500,000 DIP Loan (plus interest) from the Dairy Property sale proceeds and it would have recovered all of the milk proceeds, which consisted of approximately $800,000 to apply to the Wells Fargo Prepetition Loan. Accordingly, the bankruptcy court's decision transferred $516,000 of postpetition collateral protected by the § 552(b)(1)[14]

---

[13] The judge making the decision on the AgStar DIP Loan was not the same judge who heard the earlier matters and issued the Final DIP Order on November 29, 2012. Immediately after issuing the Final DIP Order, Judge Case reassigned Debtors' cases to Judge Haines, who subsequently issued the AgStar DIP Order on July 12, 2013.

[14] Section 552(b)(1) provides:

(continued...)

-27-

security interest extension provided in Paragraph 5 of the Final DIP Order to the payment of the DIP Loan, which prevented an equivalent payment to the Wells Fargo Prepetition Loan. Thus, the mechanism provided in the Final DIP Order to adequately protect Wells Fargo was thwarted.

Wells Fargo's argument that the "law of the case" doctrine precluded the bankruptcy court from reexamining issues already decided in the Final DIP Order lacks merit. This discretionary, judicially-imposed doctrine precludes a court from reconsidering an issue explicitly or impliedly decided by a prior disposition from the same court or a higher court. Hall v. City of L.A., 697 F.3d 1059, 1067 (9th Cir. 2012). The bankruptcy court did not appear to be reconsidering or reexamining the terms of the Final DIP Order when it made its decision as to the Second AgStar DIP Motion; it simply misunderstood the facts of the case, which led to its error. The Final DIP Order governed the obligations of the parties, particularly Paragraphs 5 and 6 that created the hierarchy of liens and collateral and how Wells Fargo would be paid. Because the bankruptcy court did not expressly overrule any

---

[14](...continued)
Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

-28-

part of that order when it made its ruling, it was required to enforce the order's terms.

Because the bankruptcy court erred when it ordered Wells Fargo to apply the $516,000 payment to the DIP Loan and deemed Wells Fargo's DIP lien satisfied, we must VACATE the AgStar DIP Order and REMAND for further proceedings.[15] The question becomes then, what sort of relief can be granted to Wells Fargo in light of the bankruptcy court's good faith finding under § 364(e). Even if AgStar's priming DIP lien created under § 364(d) must be left in place despite our vacation, allowing Wells Fargo's DIP lien to have priority over the lien securing the AgStar Prepetition Loan would be permissible under § 364(e), because it will not affect the validity or priority of AgStar's DIP lien.

**C. The bankruptcy court did not violate Wells Fargo's due process rights when it entered the Supplemental AgStar DIP Order.**

Wells Fargo challenges the Supplemental AgStar DIP Order on an additional ground — that it violated Wells Fargo's due process rights. It contends that Debtors never filed a motion to approve the additional DIP financing authorized in the Supplemental AgStar DIP Order or sought a hearing, but rather simply lodged a proposed form of order the day prior to the previously-scheduled status hearing on November 7, 2013. The bankruptcy court then improperly vacated the status hearing sua sponte and entered the Supplemental AgStar DIP Order as proposed on November 8, 2013. As a result, Wells Fargo argues that it was never given a reasonable

---

[15] Although Wells Fargo contends the Supplemental AgStar DIP Order must also be reversed, that order did not detrimentally affect Wells Fargo. Its loss was created by the AgStar DIP Order, where Wells Fargo lost $516,000.

-29-

opportunity to object or be heard and was thereby deprived of its due process rights.

"An integral part of Section 364 is the requirement that notice and a hearing be granted before a court order is issued." In re Blumer, 66 B.R. at 113. The phrase "notice and a hearing," as defined in § 102(1), is a term of art. It does not mean that a hearing must be granted. Id. The bankruptcy court may act without a hearing if notice has been properly given and (1) a hearing has not been requested or (2) there is insufficient time for one. Id. (citing § 102(1)(B). Notice means "such notice as is appropriate in the particular circumstances[.]" § 102(1)(A)). "Nowhere is there any provision for an action to be taken without notice where 'notice and a hearing' are required." In re Blumer, 66 B.R. at 113 (citing In re Monach Circuit Indus., Inc., 41 B.R. 859, 861 (Bankr. E.D. Pa. 1984)). "This is true even in emergency situations." Id.

Wells Fargo's arguments lack merit. Although it argues that Debtors never filed a motion to approve additional DIP financing, Debtors had filed the Second AgStar DIP Motion, which covered the proposed $315,000 DIP loan from AgStar that was ultimately authorized by the bankruptcy court. Wells Fargo was given the opportunity to, and did, oppose that motion. Thus, Wells Fargo's claim that the first notice it received of this additional DIP financing request was from the proposed form of order lodged by Debtors is not credible. Further, the bankruptcy court was not required to hold a hearing on the matter since all Debtors were requesting was an additional draw from the $315,000 AgStar DIP Loan already authorized by the court at a prior hearing, where

Wells Fargo's objections had already been overruled.

Accordingly, we conclude that Wells Fargo's due process rights were not violated by entry of the Supplemental AgStar DIP Order.

## VI. CONCLUSION

Based on the foregoing reasons, we VACATE the AgStar DIP Order and REMAND it to the bankruptcy court for further proceedings consistent with this memorandum.  As to the Supplemental AgStar DIP Order, we AFFIRM.